MaddeN, Judge,
delivered the opinion of the court:
The plaintiff is the trustee in bankruptcy of Texasteel Manufacturing Company. He has been authorized by the bankruptcy court to bring this suit. It is a suit for damages for alleged breach of contract and taking of the bankrupt’s property by the United States, acting through the Bureau *302 of Ordnance of the Navy Department. For convenience of expression, the bankrupt will be called the plaintiff in this opinion.
The plaintiff’s corporate stock was owned entirely by members of the Armstrong family. In 1940 it made a contract with the War Department to manufacture shells at the plaintiff’s plant in Fort Worth, Texas. From that time until the-end of the war it produced shells at that plant efficiently, and at a large profit to itself.
In February 1941, the plaintiff requested the Bureau of Ordnance, Navy Department, to put the plaintiff on its list of prospective suppliers of shells, including the 5-inch shells,, to the Navy. The plaintiff said that its facilities were presently engaged on the Army work, but that they might be available in the future. The Navy inspected the plaintiff’s, plant and advised it that it could not qualify as a satisfactory source of Navy supply unless it proposed to expand its facilities. The plaintiff, by letters and in oral conversation advised the Navy of additions which it could make to its facilities if it could get substantial contracts to supply shells to. the Navy. On April 25, 1941, the Navy wrote the plaintiff acknowledging the receipt of the plaintiff’s statements about the proposed additions to its facilities, and saying that it would give the plaintiff an opportunity to bid on its work. The Navy sent bid forms to the plaintiff, and the plaintiff on May 6 returned them without a bid saying that it hoped by about May 20th to be able to make bids, but whether it could do so or not would depend upon whether and when it could get certain equipment which it was negotiating for. On May 7 the plaintiff sent the Navy a copy of a letter which it had written to the predecessor of the War Production Board in which it discussed expanding its and its parent company’s Fort Worth facilities and also building other facilities at a new location, naming Beaumont, Port Arthur and Texas City, Texas, as advantageous places. The proposed construction included a new steel mill to produce the-steel from which shells would be made. The letter said that, the plaintiff could not finance the proposed expansion without Government aid. It said that the Emergency Plant Facility Plan had been suggested as an alternative. The- *303 plaintiff apparently desired advice as to whether such construction would be permitted.
On May 19, 1941, the plaintiff made a contract with the Beyster Corporation for the architectural services incident to the erection of a steel mill. The architect’s services were to include the preliminary survey, detailed layout for contractor’s bids, and supervision of construction.
On May 22,1941, the plaintiff submitted a bid to the Navy on 114,000 5-inch shells at a unit price of $12.744 with deliveries to be completed by July 1, 1942. This bid was accepted on June 6, though it was not the lowest bid, because other lower bidders could not meet the required delivery schedule, insisted on larger quantities than the invitation called for, or stated that Government-furnished facilities; would be required. The plaintiff’s bid gave no indication that Government-furnished facilities would be required.
On June 5, the plaintiff by letter offered to supply 20,000' 6-inch projectiles at $25.00 apiece, deliveries to commence in January 1942, or as soon thereafter as possible, contingent upon the delivery of certain named equipment for which it was negotiating. In another letter of June 5 the plaintiff asked that if it received the award of either the 114,000 shell contract or the 20,000 shell contract it be given a certificate of necessity and a certificate of nonreimbursement, as well as an advance payment. These certificates, as we understand them, were assurances that the contractor had built the facilities with its own money, and were to enable it to take accelerated depreciation on the facilities, for income tax purposes.
In still another letter of June 5 the plaintiff urged expeditious action on its application for advance payment so that the advanced money would be available to pay for the acquisition and transportation of the necessary equipment, in order that production might be started without delay. In still another letter of June 5 the plaintiff described in detail the plaintiff’s facilities, actual and planned, for the production of shells and shell forgings. This letter was in response to a verbal request for such a description. This letter described the proposed new South Texas plant as having been planned and designed for the production of 5-inch or 6-inch Navy shells. It estimated that the steel plant would produce *304 12,000 tons of billet steel monthly; that the hydraulic presses would produce 110,000 forgings monthly, and that the machine tools which had been designed, and could be completed within six months, would completely machine the shells at that same rate.
On June 7,1941, the plaintiff bid for the supply of 300,000 or 500,000, or 750,000 5-inch shells at stated prices. It offered to commence deliveries in January 1942, and continue them at the rate of 100,000 per month until completion of the contract. The bid said “An investment by our company of approximately $1,000,000 will be entailed in the purchase of” certain necessary named facilities. It also said “Architect-engineers engaged for the purpose will undertake complete installation of plant in five months from date.”
. Three contracts were let to the plaintiff between June 6 and June 21, 1941. The one for 114,000 5-inch shells was designated NOrd-153 and called for completion of deliveries by July 1,1942. The one for 20,000 6-inch shells was designated NOrd-150 and called for delivery of 2,000 shells by January 1942, and 2,000 shells per month thereafter. The third one was for 250,000 5-inch shells, was designated NOrd-171 and called for deliveries to be completed by October 1942. The plaintiff furnished a performance bond, in a designated amount for each contract, written by Seaboard Surety Company.
Contracts NOrd-153 and NOrd-150 contained agreements by the Government to advance not to exceed 30 percent of the contract price to the contractor. On July 1, 1941, the plaintiff requested an advance of $435,844.80 on NOrd-153. In its request it enclosed the advance payment bond of the Seaboard Surety Company. It stated by items what it needed the money for, viz. specified equipment and the cost of transporting it. It said that in addition to this money, and $150,000 which it was requesting to be advanced under contract NOrd-150, it would obtain the balance of the needed :$1,000,000 by a loan of $500,000 from the Reconstruction Finance Corporation, secured by a first mortgage loan on plant and realty. It further said:
The H. E. Beyster Corporation, Detroit, Michigan, has been engaged under the usual form of contract for such services, to engineer and supervise the construction of *305 this plant. The engineers estimate that the plant can be installed and placed in production within five months from the date of commencement.
The requested advances on the two contracts were made by the Government.
In its negotiations with the EFC for a loan, the EFC set proposed terms for repayment of the loan which terms the plaintiff was not willing to agree to. The plaintiff on July 19,1941, advised the Navy of this development but said that the plaintiff was prepared to go ahead with the construction of the plant, and to complete it by December 1. The plaintiff said:
Funds from advanced payments on contracts will be applied to this purpose, pending either a EFC loan on acceptable terms or the execution of the Defense Plant Corporation plan. As stated in the beginning of this letter the latter_course appears now to us to be the most desirable in which we trust you concur.
The Defense Plant Corporation plan, as we understand it, was that the plant would be built with funds advanced by that agency, would, when built, be owned by the Government, and would be leased by it to the contractor for his use in defense production. Before the Defense Plant Corporation would undertake a project it had to be recommended by the Office of Production Management and either the War or Navy Department.
The plaintiff on August 5, 1941, submitted a proposal to the Navy for either a Defense Plant Corporation arrangement, or a Government ownership arrangement, under which the Government would acquire from the plaintiff, at cost, either the entire plant, as completed and to be completed, at a cost of approximately $1,000,000, or only the equipment already acquired and that to be acquired and installed in the forge and machine shops, at a cost of $522,050. Under either alternative, the plaintiff would reduce the contract price of the shells.
As to the steel mill which the plaintiff planned in connection with the Port Arthur project, neither the EFC nor the Defense Plant Corporation would put money in it, and the plaintiff in 1942 abandoned that part of its project.
*306 On August 20 and 21, 1941, conferences were held by the Navy and the plaintiff for the purpose of negotiating a so-called “facilities contract” for the forge and machine shop at Port Arthur. The War and Navy Departments had authority to pay over, out of their appropriated funds, to contractors the cost of constructing facilities for the production of war materials. The facilities were to be paid for at their true cost, and were, of course, to be owned by the Government. H. E. Beyster, whose architectural firm had a cost-plus-a-percentage-of-cost contract with the plaintiff for the construction of the plant, including the steel mill, was present. If the “facilities contract” was made, he was to be a subcontractor of the plaintiff, which would be the prime contractor with the Government. It was agreed that he would have a fixed fee rather than a percentage of the cost of the work.
Article 1 of the facilities contract as later entered into was as follows:
Aeticls 1. Scope of Contract. — The Contractor shall with due expedition, by contract with others or otherwise, acquire and install or construct the machinery, equipment, facilities, services and appurtenances identified in Appendix A attached to and forming a part of this contract (and hereinafter sometimes collectively referred to as “the facilities” or “the Department-owned facilities”), furnishing or causing to be furnished the labor, materials, tools, machinery, equipment, facilities, supplies and services, and doing or causing to be done all other things necessarj'' for the acquisition, installation and construction thereof. All of the said facilities shall be in accordance with the drawings, specifications, descriptions and instructions set forth in Appendix A.
Article 3 of the contract provided that the contractor should submit for approval by the Navy plans, specifications, lists of machinery, etc., proposed to be used.
On September 5, 1941, the plaintiff formally requested approval by the Navy of the plans and specifications prepared by Beyster for the forge and machine shop, and of the subcontracts proposed to be made with Beyster for the architectural services, and with the proposed building contractor. These approvals were given by the Navy.
*307 On October 14, 1941, the contemplated facilities contract was made between the plaintiff and the Navy. It was designated NOd-2350. In the meantime, on October 4,1941, contract NOrd-171 was amended by a change order. The first two paragraphs of the change order were as follows:
When the above identified contract, NOrd-171, was entered into, the Contractor contemplated procuring the steel from external sources, and installing certain facilities with its own, or borrowed, funds.
Due to difficulties in financing, the Contractor has requested this Bureau to provide additional forging facilities by means of a Government ownership type of facilities contract. It is the opinion of this Bureau, based on investigation, that a shortage in forging facilities exists particularly in the southwest, and that an expansion in these facilities is necessary in the interest of National Defense. The estimated cost of the expansion of facilities to be the subject of a Government ownership contract is $550,000.00.
The change order then said that the prices in the plaintiff’s three supply contracts had been agreed upon on the assumption that the contractor would supply its own facilities, and since a contract was now going to be made under which the Government would supply the facilities, the contract prices of the three contracts would be reduced by a total of $103,125, all of which would, for convenience, be deducted from the contract price of NOrd-171.
Since the facilities contract was not made until ten days after the change order, the recital in the fourth whereas clause of the facilities contract, that the Navy and the plaintiff had entered into or were entering into contracts on the understanding that the facilities required for performance would be provided by the Navy, was true.
Work on the forging and machine shop plant began on October 22, 1941. In the meantime, the plaintiff had been going ahead with the steel mill, and had used for that purpose money which it received as advance payments on its supply contracts with the Navy. This was a departure from the representations which it had made in its applications for the advance payments. It continued to seek financing for the steel mill from the KFC and the Defense Plant Corpora *308 tion. On December 15,1941, the plaintiff advised the Navy that, barring unforeseen contingencies, the shell plant would be ready for operation in early February. On December 30 the plaintiff telegraphed the Navy that, based upon the promised delivery to it of the necessary steel and the machine tools ordered, it could finish 40,000 shells by May 1942. On January 1, the Navy complained of the delay in promised delivery. The plaintiff then sent a delivery schedule which indicated, subject to stated contingencies, large deliveries beginning in March.
On February 10, 1942, the Chief of the Bureau of Ordnance of the Navy wrote the Seaboard Surety Company, sending a copy of the letter to the plaintiff, advising it that the ability of the plaintiff to perform its contracts was in serious question, and that under one of its contracts deliveries were already in default. The plaintiff, because it had expended on its steel mill the funds advanced by the Government on two of its contracts, was handicapped by a lack of working capital. It had stated that it would not ask for an advance on NOrd-171, and hoped to borrow $900,000 from private sources on that contract. ' It did not succeed in doing so. An official of Seaboard Surety, on February 26, 1942, asked the Navy to make a 20 percent advance to the plaintiff on NOrd-171. This was done.
In March 1942 it began to appear that the forge and shell plant would not work. The hydraulic pumps were not strong enough to operate the forging equipment. The heat treating equipment would not work and had to be replaced with new equipment, which would take 10 to 12 weeks to get. There were other deficiencies with regard to the handling and other equipment. Several Navy inspectors in succession inspected the plant and each made a discouraging report about prospects for production. By March 23, 1942, the plaintiff had spent all of the $550,000 which had been named in the facilities contract as the estimated cost of construction. On April 1,1942 the plaintiff submitted to the Navy an estimate prepared by the architect Beyster, that $860,146 worth of additional facilities would be required to put the plant in operation. The plaintiff and the Navy conferred in Washington. Several possible' courses of conduct were discussed'.
*309 Seaboard Surety Company had, on March 28, 1942, obtained from the Armstrongs, stockholders of both the plaintiff and its parent company, the Texas Steel Company, a pledge of all the stock of both companies to indemnify Seaboard against liability on the bonds which it had signed for the plaintiff. The pledge agreement provided that in the event the Government declared a default on any of the bonded contracts, or in the event the Government advised Seaboard that a change in management, supervision or policy of either of the companies was necessary in order to obviate the declaration of a default, Seaboard could vote the stock of the two companies, elect officers and directors, and control the management of the companies.
After much consideration inside the Department it was decided to advance the entire additional $860,146 if certain conditions were fulfilled. Before agreeing to do so the Navy required the Surety Company to reaffirm its liability on all its bonds relating to the plaintiff’s contracts.
On June 2, 1942, the Navy received a report made by a civilian employee of the Navy, who had been sent by the Chief of the Bureau of Ordnance to inspect the Port Arthur plant and make recommendations. He recommended that the additional facilities be granted the plaintiff on condition that George W. Armstrong, Sr., chairman of the board, Allen J. Armstrong, president, and John Foster, financial officer of the Port Arthur plant, be removed from any positions of authority in the company.
On June 5 the Chief of the Bureau of Ordnance wrote Seaboard saying that G. W. Armstrong, Jr., should be made president of the plaintiff company, that the three men named in the preceding sentence be removed from any office which would give them any authority over the performance of the plaintiff’s Navy contracts, that the two Armstrongs there named be dropped from the Board of Directors, that Seaboard have a representative on the board and that an impartial third person be added. The letter said:
This Bureau suggests that the changes referred to above be effected through your inchoate power under the escrow agreement covering the stock of the companies.
*310 At the suggestion of Seaboard the letter of June 5 was withdrawn and another letter was written, as follows:
By reference (a), it was required that before proceeding with providing the additional facilities and machinery referred to therein, your company would undertake to see that the management of the Contractor is adequate to carry out and perform the subject contracts. In this connection this is to inform you that this Bureau does not consider Mr. G. W. Armstrong, Sr., Mr. A. J. Armstrong [Jr.] and Mr. John Foster as acceptable persons to occupy managerial or directive offices in the performance of the subject contracts. If your company considers Mr. G. W. Armstrong, Jr., the proper person to occupy the office of the President and General Manager or other top active executive position in the Company, this Bureau offers no objection to such appointment subject to judgment on performance.
Before final authorization and approval of the additional facilities and machinery, this Bureau wishes to be advised that the Contractor has placed in effect an acceptable organization. You are also requested to keep this Bureau advised by regular periodic reports of progress under the subject contracts.
T. V. O’Neill, the Seaboard official who had discussed the matter with the Navy then went to Texas to discuss the situation with the plaintiff’s officers and stockholders. They balked at the suggestions of the letter, and considered abandoning their Navy contracts and taking the loss but Seaboard said that if they did that, it would exercise its powers under the pledge-agreement and take control of the two companies. After further discussion it was resolved that control of all operations at Port Arthur would be put into the hands of a Management Committee, to consist of George W. Armstrong, Jr., T. V. O’Neill, and a representative of the Navy, if the Navy desired to appoint a representative to serve on the committee. The resolution provided that the arrangement should remain in effect until its rescission was approved in writing by Seaboard and the Navy. Seaboard advised the Navy of this action on June 16,1942. The Navy advised Seaboard that this arrangement would be considered satisfactory until proved otherwise by experience.
On July 8, 1942, the facilities contract was amended to increase the limit of cost to $1,409,455, to extend the estimated *311 date for completion to January 1, 1943, and to provide for the repayment by the plaintiff to the Government of all expenditures in excess of $1,000,000, the repayment to be made by applying half of the plaintiff’s net profits after payment of taxes, loans and advances.
The plaintiff produced 500 5-inch shells by June 1, 1943, 1,500 in June and July, 3,000 in August, 4,500 in September and 3,000 in October. In February 1944, the plaintiff submitted an estimate of proposed production for 1944, but its actual production fell far short of its estimate, and there were many shells rejected as defective. On June 28, 1944, the Navy gave the plaintiff notice of termination of one of the contracts, NOrd-150. That would have required the plaintiff to pay back the advance which it had received on that contract, on which it had delivered no shells. The plaintiff’s financial condition was desperate, and the only way it could finance its current operations was by being given a moratorium upon the repayment of the advances received on all its contracts. The plaintiff and Seaboard protested -the termination, and a meeting was held. In the discussions in the meeting, the plaintiff expressed the hope of greatly increasing its production. The Navy said that it would grant a moratorium on the repayment of the advance payments on all the contracts until November 1, 1944, provided that the plaintiff get its production rate up to 32,000 shells per month by that time, and show its ability to produce 39,000 shells per month thereafter. It said that it would withdraw its notice of termination of NOrd-150, and would withdraw its objection to the participation of A. J. Armstrong and George W. Armstrong, Sr., in the management of the plaintiff.
Immediately following this conference, a letter summarizing the results of the conference was sent by the Navy to the plaintiff, with a copy to Seaboard. The letter contained the following paragraph:
(7) That the surety company on your bonds consents and agrees to the amendments, including the amendment regarding moratorium on amortization of advance payments under contract NOrd-171 referred to above, and the surety and your Company restate their respective liabilities as principal and surety on all bonds executed in connection with the subject contracts without qualifi *312 cation or exception, as though said bonds had been re-executed and delivered de novo as of the date of execution of said amendments.
The plaintiff by a letter of August 14, protested the inclusion of the above language, and, in a letter to a banker, with a copy to the Navy, the plaintiff placed the responsibility for its losses on Seaboard which, the plaintiff said, acted on the demand of the Navy in displacing the plaintiff’s management in the Port Arthur plant.
On August 18,1944, on the petition of Seaboard and other creditors, a trustee in bankruptcy was appointed for the plaintiff. On August 22 the Chief of the Bureau of Ordnance wrote the plaintiff, with copies to Seaboard and the trustee in bankruptcy challenging the position which the plaintiff had taken in its letter to the banker, and demanding full performance of the contracts promptly to the full admitted capacity of the facilities provided, and stating that unless such performance was forthcoming, the contracts would be canceled for default, and liability for the default would be placed on the plaintiff. Thus the agreement for a moratorium was never completed.
Since the plaintiff, the Texas Steel Company, and the members of the Armstrong family were asserting that Seaboard was responsible for the plaintiff’s losses, and denying their liability to indemnify Seaboard for payments which it would have to make on its bonds, Seaboard sought and obtained on May 2, 1945, in the United States District Court for the Northern District of Texas, a declaratory judgment that the idemnity agreements were valid. The court also held that Seaboard was not liable to these parties for any losses arising out of the Port Arthur operations. Subsequently, on January 12, 1946, a judgment for the payment of money to Seaboard was entered. This judgment was affirmed fer curiam, by the Circuit Court of Appeals for the Fifth Circuit.
The plaintiff suffered large losses in connection with the transactions narrated above. It claims that the United States caused those losses, and is legally responsible for them. ■ It says that, to the extent that the losses were caused *313 by the inadequacies of the Port Arthur facilities, the fault is the Government’s because it was bound to furnish adequate facilities. The plaintiff says that from the beginning of negotiations, it was understood that the facilities would have to be provided by the Government. That is not the fact. In the discussions and correspondence there was frequent mention of an NFC loan or a Defense Plant Corporation construction, but there was also frequent mention of Certificates of Necessity and Non-Keimbursement, which presupposed private financing. Even if it had been assumed that one of the several possible forms of Government.financing would have to be-used, that would have put no responsibility on the Navy Department for the use of the money obtained, and the adequacy of the facilities obtained with, the money.
When the three supply contracts were entered into, several months after the beginning of negotiations, there was no-provision, either express or assumed, that the performance of the contracts was conditioned upon the furnishing by the Navy, or by the Government, of facilities. There was still collateral mention of a Government loan or financing, but. there were also the direct statements referred to above which assumed that the construction of the facilities would be privately financed.
The arrangement was changed, and the Navy undertook to provide facilities because it became obvious that the plaintiff was not going to be able to do what it had contracted to do unless the Navy provided facilities. The amendment of the supply contracts expressly stated that the contracts as originally made had contemplated that the contractor would supply its own facilities. The facilities contract, made in October 1941, was made after the plaintiff and the Beyster firm of architects, chosen by the plaintiff, had presumably been working for several months on the plans and specifications for the facilities. The Navy had a right to assume that those plans, made for the plaintiff which was already experienced in producing shells successfully for the Army at its Fort Worth plant, were adequate. The plaintiff makes something of the point that it sent Beyster’s plans on to the Navy without looking at them. Beyster was the plaintiff’s *314 man and, as it turned out, it was a reckless thing for the plaintiff to do to repose such, confidence in him. But that was the plaintiff’s recklessness, and it cannot be passed over to the Government. It was the plaintiff that was going to have to use the plant, to fulfill its contracts to make shells, and it should have seen to it that the plant as designed would produce shells as called for by its contracts.
The estimated cost of the facilities which the plaintiff was asking the Navy to pay for proved to be much less than half of what turned out to be the actual cost. While the plaintiff expressly refrained from warranting the accuracy of the estimates, neither party assumed that the estimated cost would have no relation whatever to the actual cost. The Navy did not agree that it would put up money, without limit, to construct facilities. It finally did put up the additional money, because of its great need for shells, and because of the time and money that had already been sunk in the venture.
The Navy concluded, rightly it would seem, that the whole affair had been incompetently managed by the plaintiff. It felt compelled, by the necessities referred to above, to pay out more additional money than what it had already paid out. It was its duty to try to see that, this time, it got for the Government’s money what it had been led to expect to get before. It urged the Surety Company, which had a legal right to exercise control over the plaintiff’s management, to exercise that right. The Surety Company, which was being victimized by the same incompetent management, was in no sense bound to follow the recommendation of the Navy. It did not, in fact, follow it, but worked out with the plaintiff the .scheme of a Management Committee. The results were not good, but they couldn’t have been worse than they had been ■before the change.
One who is bedeviled, as the Navy was, by the persistent failure of another to do what he has agreed to do, does not lose his rights under the contract, nor become liable for the ■other party’s losses, by complaining of what he regards as incompetent management and demanding a change to what he thinks would be better management. If he is a seafaring man, as was the Chief of the Bureau, it is not surprising if *315 he uses florid language of the Captain Kidd variety, in demanding the change.
Many of the plaintiff’s difficulties resulted from the fact that it had no working funds with which to finance its performance. The advance payments on its contracts had been used up months before it was ready to produce any shells, for purposes which had no direct relation to the production of shells. The Navy, too indulgently, permitted this to be done, but the plaintiff did it, and there is no reason why the Government should have to pay for the plaintiff’s mis judgment.
The whole Port Arthur transaction was a costly misfortune for the plaintiff. It sought, in the District Court litigation referred to above, to shift its losses to the Surety Company. It did not succeed in doing so. In this litigation it seeks to shift them to the Government. It seems to us that the only way the Government could have prevented the plaintiff’s losses would have been by foreseeing that the plaintiff could not perform the contracts which it ardently sought, and refusing to make the contracts.
The plaintiff is entitled to recover for transportation taxes paid by it for which the Navy agreed to reimburse it. It may have a judgment for $3,544.71.
It is so ordered.
Laramoee, Judge/ Whitaker, Judge/ Littleton, Judge/ and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Ray O. Shaffer is the trustee in bankruptcy of Texasteel Manufacturing Company, appointed by the United States District Court for the Northern District of Texas and duly authorized by that court to institute this action.
Texasteel Manufacturing Company was incorporated in 1938 to operate the oil well supply department of Texas Steel Company, all of its $300,000 of capital stock being issued to the latter company. In 1942, the members of the *316 Armstrong family, who owned the stock of Texas Steel Company, purchased from it the stock of Texasteel Manufacturing Company for the sum of $260,000.
For convenience, the term plaintiff will be used herein as referring to Texasteel Manufacturing Company.
2. In December 1940, the plaintiff contracted with the defendant through the War Department for the production of the body and the nose adapter for 81 mm. shell. From that time until about V-J Day in August 1945, the plaintiff produced satisfactorily and at a profit about four million such items plus two million related ordnance items for the Army at its Fort Worth plant.
3. In February 1941, the plaintiff wrote to the Chief of the Bureau of Ordnance, Navy Department, requesting that it be included on the Navy’s list of prospective suppliers of certain types of shells, including 5-inch. In describing its facilities, the plaintiff explained that most of its machine tools were to be employed on Army shell production for the next twelve months and that it was negotiating for additional Army contracts, but having no assurance that thei Army would require facilities beyond those contracted for, it wanted an opportunity to quote on present and future Navy requirements. An inspection of the plaintiff’s Fort Worth plant was made by a Navy inspéctor. It was reported by that inspector to the Chief of the Bureau of Ordnance that the plaintiff did not have facilities to manufacture 20 mm., 40 mm., or 5-inch projectiles.
4. By letter of March 17, 1941, the plaintiff was advised that since its indicated production rate of small shells was low, it was doubtful whether the firm could qualify as a satisfactory source of Navy supply unless the company proposed more expansion of its facilities. The plaintiff sent the following letter to the Navy Bureau of Ordnance dated April 3,1941:
‡ ^ ‡
First, .in reference to our plant capacity for the production of 3" A. A. projectiles, please be advised that since date of inspection another National 5" heavy duty forging machine has been placed on order for July delivery. The manufacturer of this equipment estimates an average out-put of 100 pieces per hour of 8" A. A. *317 shell forgings. With machine tools available in our own shop and those of sub-contractors interested witht us, we submit that we will be able to produce, as of about August 1, 1941 and thereafter, at the rate of 50,000 to 60,000 3" A. A. projectiles per month.
Second, in reference to 1.1" projectiles, we now have-installed one four-spindle 1%" Gridley Automatic, and have on order for August delivery one six-spindle 2%"' Acme-Gridley automatic. We contemplate purchase of other suitable equipment if used machines can be located, or so soon as we may obtain priorities. Hence,, we are confident that we could considerably step up the proposed production rate of from 10,000 to 12,000 1.1" A. A. projectiles if required to do so.
Permit us to add that our parent organization and. the supplier of shed steel and bar stock, the Texas-Steel Company, has let contracts and construction work is under-way for the expansion of its plant, in line with-the program of expansion mentioned in memoranda of' February 14, 1941 that was personally delivered to Lt.. Commander Bateman. It is estimated that expanded! facilities of the plant will be in full production within 7 months from date.
On April 5, the plaintiff sent a further letter to the Navy-Bureau of Ordnance as follows:
We neglected to state, in our advice to you of the 3rd,, that in addition to the one 5" forging machine to be delivered to us in July, we have on order still another 5" forging machine and one 6" forging machine on which we expect delivery in November or December.
These, together with the machines already installed,, will give us a battery of seven upset forgers, ranging-in size from 1" (which is probably too small for any production in which the Navy would be interested) to-6" in size. We are also disposed to purchase Baldwin-Southwark equipment for the forging of heavy shells,, on which equipment we can get delivery in from 14 to> 16 weeks subject to preference rating, should we be invited to bid on corresponding size shell forgings.
We do not have drawings on either the 3" A. A. or 1.1" A. A. projectiles, referred to in your favor of the-17th of March, and it would be much appreciated if these might come forward to us now so that we may have-ample time to prepare our estimates. We have located three additional multiple spindle automatics that can be employed on the last mentioned item on a sub-contract basis.
*318 5. Mr. A. J. Armstrong, who was then vice president and general manager of the plaintiff company, had discussions with representatives of the Navy Bureau of Ordnance concerning the consideration by that Bureau of an award of contracts for projectiles. He indicated that the plaintiff could readily install the necessary facilities required for the production of such pro j ectiles. At about this time Mr. Armstrong learned through an officer in the Machine Tool Section of the Bureau that the Navy had certain machinery located at its South Charleston, West Virginia, installation which it intended to dispose of to a producer of defense material.
On April 23,1941, Mr. A. J. Armstrong, on behalf of the plaintiff, wrote a letter to the St. Louis Ordnance District of the Army in which he proposed that the plaintiff could erect and place in operation within six months from the date of a letter of intent a complete plant for the production of steel and 155 mm. or larger shell forgings at a cost of about $600,000, the plant to be located at Beaumont, Port Arthur or Texas City, Texas. In this letter the plaintiff mentioned the equipment which the Navy wished to dispose of at its South Charleston installation. Regarding the financing of the proposed plant the letter stated as follows:
*****
Because of the heavy expenditure that we have already committed ourselves to in the expansion of our facilities at the Fort Worth plant, carrying ourselves there for increased production of steel and of shell forgings, we cannot undertake to finance the above without Government assistance. This might be extended to us in any of several ways. If the matter is sufficiently urgent, the emergency plant facility plan might be ap-glicable, or we might have recourse to the Defense Plant torporation. We believe though, that a simple letter of intent to contract, together with a Necessity Certificate, would be considered By the Reconstruction Finance Corporation sufficient to extend a loan secured by a first lien on the mortgagable equipment and the real property on which it is located. It is necessary though that we move expeditiously since either the electric steel furnaces offered by the Navy Department or the rolling milla offered by the liquidator of the Lebanon Steel Company, or both, may not be available at a later date.
*319 6. On April 25,1941, the Bureau of Ordnance of the Navy acknowledged receipt of the letter of April 5 quoted in full in finding 4, and sent copies of drawings requested therein. The letter stated further as follows:
The additions to your equipment as stated in reference (a) are noted. The Bureau will forward proposals and specifications whenever material is to be ordered which appears to be within your capacity to manufacture.
7. The Navy sent bid forms to the plaintiff for some ordnance materials, and the plaintiff, by letter of May 6, 1941, returned the drawings and bid forms without entering a bid, ■stating that it hoped to be able to enter bids on May 20th and May 23rd but that this would be conditioned upon the status of its negotiations for electric furnace equipment at the South Charleston Navy Yard and delivery dates on other necessary equipment.
8. On May 7,1941, the plaintiff forwarded to Commander Braine of the Navy Bureau of Ordnance, who was then Chief of the Projectile Branch of the Production Division, a copy of a letter it had sent the day before to the Steel Division of the Office of Production Management, the predecessor agency of the War Production Board. This was a four-page letter outlining the proposed expansion at Fort Worth of the facilities of both Texas Steel Company and the plaintiff and proposing the enlargement of facilities at a location apart from Fort Worth, namely in Beaumont, Port Arthur or Texas City. The letter discussed advantages of each location respecting transportation, power, gas and tax rates, labor and raw material. The letter continues in the following terms:
4. Plant and Equipment. — A low cost plant can be assembled largely from now idle but usable equipment consisting of the following:
a. Equipment from the South Charleston, West Virginia, Navy Yard.
The Navy Bureau of Ordnance has offered items listed below at a nominal purchase price or on a rental basis with an option to buy:
2 — 30 ton electric steel “Heroult” furnaces with 1 Tilling Motor for each furnace — without transformers.
1 — 6-ton electric steel “Heroult” furnace with transformer.
17 — Ingot molds 6 to 18 tons.
*320 3 — Foundry flasks 20' x 15' x 36".
16 — Ladles 5 ton to 100 ton capacity, ladle stands, ladle stools, etc.
2 — Hydraulic presses — 500 ton capacity; 4 column vertical type,, hydraulic pressure for operating 2500 pounds, including dies.
1 — Hydraulic accumulator 32' x 15', sufficient for both presses.
1 — #3 trimming press with Allis Chalmers 7% H. P. motor-complete.
2 — 3-phase 335 H. P. motors.
1 — Bank of 1000 KVA transformers (these are not suitable for the 30-ton electric furnace but can be used on plant power line).
b. Equipment from Lebanon Steel Company in liquidation.
The Liquidator offers a large amount of rolling mill: equipment, most of which is unsuitable for the purpose-but which does include:
1 — 22" Rolling Mill and 1 — 9" Rolling Mill
tha[t] can be used to break down and roll ingots for shell forgings and other purposes. These have been; offered at $15,000 and $9,000, respectively, provided Liquidator does not sell plant in its entirety on or before-May 10th.
c. Baldwin-Southward Forging Equipment.
Baldwin-Southward offers draw equipment to be used' in conjunction with the two 500-ton Navy presses and the Navy accumulator at a price of $16,000. A unit of production has been worked out with the Baldwin-Southward engineers that will turn out 155 mm. shell forgings (approximate weight 150 lbs. each) at the rate-of 185 per hour. Total cost will not exceed $25,000, exclusive of cost of Navy equipment.
Transformers, motors, cranes, a reheating furnace- and other necessary equipment would have to Be purchased on the open market. Consulting engineers have-not completed estimates but it seems conservative to-assume that, excluding cost of or rental for the Navy equipment but including freight and installation costs,, a plant capable of producing 10,000 to 12,000 tons of' electric steel monthly and of forging upward of 150,000' shell forgings monthly can be installed and put into-operation for between $500,000 and $600,000. It should be possible also to get the plant into production within from four to five months provided prompt deliveries of' supplementary equipment can be secured.
For most economic and efficient production the plant should be enlarged by the addition of probably two-60-ton open hearth furnaces and fully modernized throughout. Equipment should be installed also for- *321 heat treating and cold drawing alloy steel tor small ammunition and bullet cores, but to produce tonnage at the earliest feasible date, the initial unit outlined above might be put into operation without delay.
5. Disposition of Output. — Army (St. Louis Ordnance District) and Navy (Commander C. O. Braine) Ordnance and the Army and Navy Munitions Board (Colonel W. E. Slaughter) have been apprised of the above plan. Concretely it has been proposed that the plant be employed for the following purposes:
a. To U. S. Army Ordnance (St. Louis Ordnance District) for the production of 155 mm. shell forgings to the capacity of the forging unit described above. Definite interest is manifest in this and advice under date of May 3rd has been received that this item will ■come up for procurement within about ten days. Some 360,000 monthly of these 155 mm. shell forgings have been allocated to this district.
b. To the Army and Navy Munitions Board and the Small Arms Division of Army Ordnance, our companies have proposed to produce and have been tentatively allocated 1,000 tons monthly of bullet core steel, heat treated and cold drawn. Experiments at the Fort Worth plant to date have been disappointing which is now believed to be due to the two limiting factors of ■small ingots and high speed commercial finishing mills neither of which can be rectified at this plant. It has therefore been concluded that the proposed South Texas plant should be properly equipped for this purpose.
c. To Navy Ordnance it has been tentatively proposed to turn out cold drawn steel for 20 mm., 1.1" and 40 mm. shells, which would require substantially the same equipment used to process bullet core steel. Also the possibility has been discussed of 3" and 5" Navy shell forgings and of alloy steel and alloy steel forgings for other Navy purposes.
6. Financing. — Because of the heavy expenditure that we have committed ourselves to in the expansion of the Fort Worth plants, we cannot undertake to finance the above without Government aid. The Emergency Plant Facility Plan has been suggested as an alternative and it is with this in view that this matter is referred to your Committee. We believe that it will have the support of both of the Service branches.
Eespectfully submitted.
TeXASTEEL MANUFACTURING COMPANY,
Vice Pres. and Gen. Mgr.
*322 9. By May 19, 1941, the plaintiff entered into a contract with the H. E. Beyster Corporation for the architectural services incident to the erection of a steel mill. Beyster was, under such contract, to receive a fee of five percent of the cost of the work, not including the cost of land. The contract provided that in the event the owner did not proceed with the structure he should reimburse the architect for all costs and overhead plus 20 percent. It provided also that this was to be the basis of reimbursement in the event the work was to be financed by Government funds and if the Governmental agency supplying the financing would not. recognize Beyster as the architect.
10. On May 20, 1941, Mr. A. J. Armstrong, for the plaintiff, wrote to the Beyster firm discussing the work which the plaintiff expected of the architect under the contract referred to above, including (1) the preliminary survey, (2) detailed layout for contractor’s bids, and (3) supervision of construction. Under preliminary survey were itemized the inspection of used equipment, plant layout for the essential units required to get a low-cost plant into early production of electric steel, forging billets and 155 mm. shell forgings, cost estimate of initial plant, estimate of capacity for initial plant, cost estimate on steel production, and a plant layout for plant extension. Under detailed layout for contractor’s bid were included the plant layout for initial plant, plant layout for extension of plant, and also a plant layout to cover equipment necessary for commercial production of:
1. Oil well and refinery tubing;
2. Structural shapes;
3. Merchant bars.
In this letter Mr. Armstrong stated that the Army showed interest in the project and that he had been assured that the Army would recommend extension of emergency plant facilities.
11. On May 21, 1941, Mr. A. J. Armstrong, for the plaintiff, wrote to the St. Louis Ordnance District advising that the plaintiff had located all essential equipment for the plant and had completed designs for the shell forging and *323 rough turning layout, having tentatively arranged for all necessary equipment. This letter concludes as follows:
We cannot proceed further with the matter until we have secured either Emergency Plant Facilities or a Supply Contract of sufficient size to justify the investment except under one of these conditions. The Navy Ordnance, however, has earmarked this for us and will hold until further notice.
We prefer Emergency Plant Facilities because this entails less negotiation and can be more readily expedited and? for the further reason, that this means of financing obviates the necessity of accelerated amortization of the capital investment. However, should we be denied these facilities but extended the opportunity to bid on a large volume of 155 mm shell forgings, we would certainly endeavor to negotiate with you a contract that would justify us in assuming the risk of assembling this plant without Government aid, provided, of course, we could at the same time secure the requisite certificate of necessity.
12. On May 22, 1941, the plaintiff submitted a bid on 114,000 5-inch anti-aircraft projectiles at a unit price of $12.744 with deliveries to be completed by July 1,1942. This bid was unqualified in any way. It was accepted on June 6, 1941, though not the lowest bid because other bidders whose bids were lower could not meet the required delivery schedule, insisted upon larger quantities than called for, or stated that Government-furnished facilities would be required.
The plaintiff’s bid did not indicate in any way that Government-furnished facilities would be required.
13. On May 28,1941, bids were opened at the Navy Bureau of Ordnance on a further schedule of ordnance items. On one such item of 20,000 6-inch projectiles, no bids were received. Thereafter on June 2, plaintiff offered to produce this requirement, and on June 5, by letter, recalled the June 2 offer and made a further offer to produce such projectiles at a unit price of $25, or a total of $500,000 for the 20,000. In such letter of offer, the plaintiff states that deliveries would be commenced January 1942, or as soon thereafter as possible, contingent upon delivery of hydraulic presses, accumulator and other equipment for which it was negotiating.
*324 By further letter of June 5, 1941, the plaintiff asked that if it received an award of either the 114,000 5-inch projectiles referred to earlier or the 20,000 6-inch projectiles, it be given :a certificate of necessity and a certificate of non-reimbursement as well as an advance payment. Another letter of the :same date urged that expeditious action on the application for advance payment be taken in order that the proceeds might be available to apply to the acquisition and transportation of the necessary equipment so that production might he started without delay.
Still another letter of June 5,1941, was sent by the plaintiff to the Chief of the Navy Bureau of Ordnance advising that •official of the plaintiff’s facilities, actual and planned, for the production of shells and shell forgings. This letter is quoted below:
Pursuant to verbal request from the Bureau of Ordnance, we are pleased to inform you concerning our facilities, actual and planned, for the production of shells and shell forgings, viz:
TORT WORTH PLANTS
At the Fort Worth plant of the Texas Steel Company, the parent organization and the supplier of our raw material, is one electric steel furnace in production capable of turning out 800 tons of electric steel billets monthly, and a second furnace that will be installed in September of this year with a capacity of 1650 tons monthly, or a combined possible output on or before November 1st of 2,450 tons of billet steel.
At the Fort Worth plant of the Texasteel Manufacturing Company there are installed and in operation four forging machines, ranging in size from. 1 y2" to 4". One 5" forging machine will be installed in August of this year and one 5" and one 6" forging machine are on ■order for December 15, 1941, delivery. These two last mentioned machines on order are subject to cancellation.
The machine shop of the Texasteel Manufacturing Company is tooled up for the complete machining of 81 mm. M43A shells, but all equipment is suitable for 3" and 4" shells. The shop will have been completely tooled to a capacity of approximately 100,000 machined shells by October 1,1941.
Subcontractors’ plants, now machining 81 mm. shells, can completely machine with existing, facilities in excess *325 of 50,000 3" or 4" shells monthly, and other machine tool facilities are available to approximately double this rate.
The Texasteel Manufacturing Company and its subcontractors will have completed present contract on or before February 1, 1942. Thereafter facilities will be available for the production of 3" and/or 4" Navy shells unless otherwise contracted for in the meantime.
This may be undertaken at the rate of 100,000 forged and completely machined shells monthly, based on the output of the 4" forging machine now installed and the 5" forging machine that will be installed in August of this year. The rate of production can be increased to 200,000 forged and machined 3" and/or 4" shells should orders for the one 5" and one 6" forging machines for December 15th delivery be confirmed. This is contingent on securing additional contracts that will justify the investment.
south TEXAS PLANT
This plant has been planned and designed for the production of 5" or 6" Navy shells and/or 15'5 mm. and 105- mm. Army shells and to utilize existing facilities now lying idle at the South Charleston, West Virginia,. Navy Yard.
The electric furnace capacity is estimated at 12,000' tons of billet steel monthly. The two hydraulic presses with accessory equipment are rated at a capacity of 185 heavy shell forgings per hour, or at 110,000 forgings monthly, based on a 600 hour month.
Single purpose machine tools have been designed by us and can be completed within from five to six months to completely machine shells at the same rate of production. Negotiations have been entered into also with subcontractors to preclude any delay of schedules on this account and in order to utilize all existing machine tool facilities possible.
Certificates of Necessity and Non-Keimbursement to cover the above investment will be required, for which application has been filed.
Trusting that this is the information required, we are
14. On June 6,1941, Commander Braine directed a memorandum to the Chief of the Planning and Progress Section of the Production Division of the Bureau of Ordnance requesting authority to award a contract to the plaintiff for 20,000 6-inch projectiles. In such memorandum he stated *326 that no Government-furnished facilities would be requested.
15. On June 7, 1941, the plaintiff submitted to the Chief of the Bureau of Ordnance, Navy Department, a proposal for the furnishing of additional 5-inch projectiles in the following terms:
We are pleased to confirm our verbal alternative bids to furnish 5"/38 AA Common Projectiles, marked XXXI, in strict accordance with drawings and specifications, f. o. b. manufacturer’s plant, as follows:

We have been awarded contract to furnish 114,000 5"-AA Projectiles to the same specifications at a unit price f. o. b. plant of $12.197 each, delivery to be complete [d] by July 1942. If awarded additional contract on this bid, deliveries will be commenced January 1942 and continued at a monthly rate of 100,000 units until completion of contract.
These projectiles will be manufactured at a specially built plant that will put into production two 30-ton electric steel furnaces, two 500-ton hydraulic presses, accumulator and other accessory equipment belonging to the Navy Department and now located at the South •Charleston, West Virginia, Navy Yard. An investment by our company of approximately $1,000,000 will be entailed in the purchase of a blooming mill, motors, transformers, cranes, reheating furnaces, etc., and in single purpose machine tools designed by our engineering department that will be built in our own and subcontractors’ shops, and in land, trackage and buildings. Arrangements have been made for the rental of the Navy equipment and our company is proceeding with the purchase of the other necessary equipment. Architectural engineers engaged for the purpose will undertake to complete installation of plant in five months from date.
Plant will be located at Port Arthur, Texas, on the Intercoastal Canal, from which point shipments can be made either inland via the canal and the Mississippi Valley waterway system, or coastwise to seaboard ports.
We will undertake to enter a bid, on or before the 10th instant, on the 68,000 5" Illuminating shells.
*327 16. On June 10,1941, Commander Braine of the Projectile "Section directed a further memorandum to the Chief of the Planning and Progress Section of the Production Division requesting authority to award a contract to the plaintiff for •250,000 5-inch projectiles. He stated in such memorandum that no Government-furnished facilities would be required.
17. Three supply contracts for Navy projectiles were ¡awarded to the plaintiff between June 6, 1941 and June 21, 1941. The contract covering 114,000 5-inch shells was dated .June 6, 1941, bore number NOrd-153, and called for deliveries to be completed by July 1, 1942. The contract covering 20,000 6-inch shells was dated June 18, 1941, bore the number NQrd-150, and called for delivery of 2,000 shells •by January 1942, and 2,000 per month thereafter. The contract covering 250,000 5-inch shells was dated June 21,1941, 'bore the number NOrd-171, and called for deliveries to be •completed by October 1942. Plaintiff furnished a performance bond, written by Seaboard Surety Company, in •connection with each of these contracts, in the respective ■amounts of $72,640.80, $50,000.00 and $149,375.00.
18. Contract NOrd-153 contained the following provision:
Article 31. Advance Payments. — The Government agrees to advance to the Contractor a sum not to exceed thirty per cent (30%) of the contract price to facilitate the manufacture of the material hereunder. The funds required for this purpose will be advanced from time to time at intervals of not less than fifteen (15) days as requested by the Contractor. The sums so advanced shall forthwith be deposited by the Contractor in a special account or special accounts, separate and distinct from any of the funds of the Contractor, and the disbursements therefrom shall be made only for the purposes of this contract.
The funds advanced will be liquidated by crediting forty percent (40%) of each payment becoming due under this contract to the advance until the full amount of the advance is liquidated.
It is agreed that in case of default by the Contractor in the performance of this contract or any termination thereof before liquidation of the advance, due to causes of the Contractor’s responsibility, the Contractor shall refund to the Government upon demand a sum equal to the unliquidated advance, all other provisions of the *328 contract and all rights of the Government to remain in full force and effect. It is further understood and agreed that in event of termination of this contract as-hereinafter provided, Contractor likewise agrees to refund to the Government upon demand a sum equal to the unliquidated advance outstanding at the time of said termination.
Pursuant to this, plaintiff on July 1, 1941, requested that the sum of $435,844.80 be advanced to it under the contracts Its request for this advance reads as follows:
We return herewith triplicate copies of contract NOrd 153, duly signed and witnessed, with performance bond executed by the Seaboard Surety Company attached, together with certified copies of Certificate of Registration, under the provisions of Section 12 (g) of the Joint Resolution approved by the President November 4, 1939.
Attached also is advance payment bond of the Seaboard Surety Company in the amount of $435,843.80.
It is requested that this advance payment be deposited' forthwith in the Whitney National Bank, New Orleans, Louisiana, where it will be carried in a special account separate and distinct from any funds of the contractor. Funds are immediately needed for the following purposes, all in pursuance of the performance of this contract, viz:
Supply Officer, U. S. Naval Ordnance Plant, South Charleston, W. Va., bid deposit_$5, 000-$10,.000
(Balance of the purchase price must he paid in cash in ten days from date of award. The final amount has not yet been determined.)
Dismantling and loading furnaces, presses and other equipment at the South Charleston Navy Yard con-demanded to be sold, est_ 12,000;
Freight South Charleston to Port Arthur, Texas, estimated 200,000 lbs. @ $1.30 cwt_ 2, 600
Repair Navy Forge and Furnace equipment, est_ 20,000-
Ritterbush & Co., Inc., New York, down payment 70-ton traveling crane_ 2,500‘
Balance for traveling crane, represented by 30- and 60-day trade acceptances_ 15, 000-
Freight and unloading expense 70-ton crane_ 4,750
Foster & Company, Pittsburgh, Pa., 1 21''-5 stand used rolling mill, repair and freight to Port Arthur, approximately- 60,000>
Foster & Company, Pittsburgh, Pa., used structural steel mill buildings dismantling and transportation, est_ 75,000-
Great Lakes Steel Company, Detroit, Michigan, one 1500 H. P. Motor and Drive, plus freight and loading cost, approximately- 40,000-
Salem Engineering Company, Salem, Ohio, furnaces and Assel Mill, down payment on a total price of $88,940, balance in five equal monthly installments_ 14,825-
*329 1 — 1500-ton crane, charging crane, and floor charger, approximately-$24,500
Preheating furnaces, forging dies, cutting benches, cutting torches, descalers, conveyor tracks, sizing presses, air compressor, by-pass valves, tongs and hangers— principally used equipment offered for cash sale_ 86,650
Used single purpose machine tools with hydraulic fixtures, offered for cash sale and subject to prior sale_ 89,500
Estimated total required immediately cash disbursement, exclusive engineering fees and supervisory cost_ 457,325
The engineers’ preliminary estimate of the total plant investment involved, including land, buildings and machinery, is slightly in excess of $1,000,000. Advance payment of 30% on contract awarded June 18th for 20,000 6"/47 Bombardment Projectiles has been requested that will amount to $150,000. The balance will be financed by an EFC loan of $500,000, secured by a first mortgage lien on plant and realty. No advance payment will be requested on contract NOrd 171 amounting to $3,987,500.
The H. E. Beyster Corporation, Detroit, Michigan, has been engaged under the usual standard form of contract for such services, to engineer and supervise the construction of this plant. The engineers estimate that the plant can be installed and placed in production within five months from date qf commencement. Trusting that the release of the requested funds will be expedited so that this work may proceed without delay, we are
This advance payment of $435,844.80 was made by the Navy, and was secured by a repayment bond executed by Seaboard Surety Company.
19. Contract NOrd-150 contained provisions with respect to advance payments identical to such provisions in contract NOrd-153 quoted in the preceding finding. Under date of July 18, 1941, the plaintiff requested an advance payment of $150,000 or 30 per cent of the total amount of contract NOrd-150. In its letter requested the furnishing of such advance payment, the plaintiff stated in part as follows:
We are asking that you airmail vouchers for the receipt of the advance payment as soon as this can be done in order that we may secure the funds promptly.
This money will be disbursed in payment for plant site and additional equipment for plant and in part payment of the cost of erection thereof. The deposit will be made in the First National Bank of Beaumont in a *330 special account separate from that of other funds of the contractor.
This advance payment in the sum of $150,000 was made to-the plaintiff about July 30,1941. It was secured by a repayment bond executed by Seaboard Surety Company.
20. During this period negotiations with respect to the-purchase by plaintiff of the surplus foundry and steel milli equipment at South Charleston were proceeding. The Navy eventually advertised such equipment for sale as a single lot on competitive bids, the invitation for bids containing the-following provision:
The equipment described above is offered for sale-, only as one lot and for use by the purchaser in his own. plant on defense contracts held by him.
Plaintiff submitted a bid of $20,000 for the material, and it. was awarded to it at this price on July 16,1941.
21. Starting sometime prior to June 15, 1941, plaintiff' had been negotiating with the Eeconstruction Finance Corporation for a loan of $1,000,000, to be used to construct a steel plant to supply steel for the manufacture of these shells andi those covered by its Army contracts. One member of the-Armstrong family, George W. Armstrong, Jr., felt that this expansion was unwise, and the proposal was that a separate corporation be formed to take over the Navy contracts, borrow the money, and erect the plant. The Eecon-struction Finance Corporation indicated that it might’ approve the loan on the condition that the company or its; stockholders pledge $250,000 of additional collateral for the-loan, and that 75 percent of earnings be applied in liquidation! of the loan. These conditions were unacceptable, first because of obligations the stockholders then had to Seaboards Surety Company as guarantors on indemnity agreements,, and second because it would prevent further plant expansion, out of earnings.
Plaintiff advised the Navy of this development on July 19, 1941, listed its purchases to date, which then aggregated $265,432, and stated in part as follows:
Our engineers estimate that the cost of buildings will1 amount to a little over $100,000.00 and that the total cost of plant, including shipping costs, foundations and in *331 stallation, but exclusive of cost of machine tools and any additions to the forge shop, will not exceed $600,000.00. This will be an exceedingly low-cost plant and, if it can be built within this estimate, even considerably lower than we ourselves had originally figured. It will be capable of producing 10,000 tons of billet or bar steel per 600 hour a month and turning out 5" or 6" shell forgings at the rate of not less than 120,000 per 600 hour a month.
The machine shop will be tooled largely with single-purpose tools that our Mr. A. F. Spengler has designed and for which the special fixtures and accessories have been ordered. We estimate our tooling up cost at $225,000.00 maximum to completely machine Navy shells under contract at the rate of 200 per hour. Tools in our Fort Worth shop will be used on adapters, fuse plugs, etc.
He He He He
Mr. H. E. Beyster, President of the H. E. Beyster Corporation that we have engaged to engineer and supervise the construction of this plant, will meet my father and me at Port Arthur Friday, July 25. We are prepared to proceed immediately with the work to complete the job on or before December 1. Funds from advance payments on contracts will be applied to this purpose, pending either a E. F. C. loan on acceptable terms or the execution of the Defense Plant Corporation plan. As stated in the beginning of this letter, the latter course appears now to us to be the most desirable in which we trust you concur.
22. Plaintiff then submitted an application to Defense Plant Corporation, requesting it to build the steel plant. Plaintiff then learned that all applications for Defense Plant Corporation assistance had to come to that organization through the Office of Production Management and either the War or Navy Department. Plaintiff therefore approached the Navy Bureau of Ordnance early in August to attempt to secure its endorsement.
23. A specific proposal was submitted to the Navy under date of August 5,1941. This proposal, which was captioned “Proposed Port Arthur Shell Plant,” read in material part as follows:
2. Alternative plans of the Defense Plant Corporation, of Government ownership and of Emergency Plant. *332 Facilities have been studied and legal advice on the operation of the first two mentioned, obtained from Mr. Randall Compton, Special Assistant to the Under Secretary.
3. Any of these means of financing appears adaptable to the case, but, as the Government ownership plan seems the most expeditious, it is suggested that this might be given first consideration. It is our understanding that the Secretary of the Navy has statutory authority to issue “Letter of Intent” of contract of Government ownership.
4. Under this plan, or under the Defense Corporation plan, the company suggests one of the following alternatives:
a. To transfer to the Government, at cost, all equipment thus far purchased or contracted for and to com-pleteplant to plans and specifications to be approved by the Government, at cost, and to transfer the land on which plant will be located, if desired by the Government, at cost, so the title to all the plant will be vested in the Government, or in the Defense Plant Corporation, as the case may be; or
b. To proceed at the company’s expense to install the furnace and rolling mill department, applying proceeds from advance payments on contracts for the purpose, provided the requisite Certificates of Necessity and of Nonreimbursement will be issued to cover this investment, and to retain title to this part of the plant and to transfer to the Government, at cost, all forging and machine tool equipment purchased or contracted for to ■date and to complete the forge and machine shops, at cost, to plans and specifications to be approved by the Government.
5. Though the price to be paid under any of the company’s supply contracts does not include any allowance for cost of acquisition or for amortization or de-preciations, except such as properly included under fixed overhead charges, the company is agreeable to a reasonable reduction in price to offset the advantages gained under the plan of Government financing adopted over that of RFC financing contemplated when the contracts were negotiated. (See attached cost estimate on which 'bid price was based.)
6. Alternative 4-a above will involve an investment ■on the part of the Government, based on engineer’s preliminary estimates, of either of the following amounts as may be elected by the Government:
*333 i. Shell plant, exclusive of land and of the cost. of a second forging unit purchased primarily to fill a War Department contract and that will be employed for this purpose through April, 1942, approximately_ $976, 518.00
ii. Plant inclusive of land, at cost (250 acres @ $200 per acre), approximately_ 1,026,518.00
iii. Plant, inclusive of land and of second forging unit, approximately_ 1,275,108.00
(The above figures do not include installation of either electric steel furnace nor one of the two 21" rolling mills acquired, since these additional facilities are not at present needed.)
Alternative 4-b would involve on the part of the Government, based on engineer’s estimates, either of the following amounts at the election of the Government:
i. Forge & Machine Shops, inclusive of only one forging unit, approximately_$522, 050. 00
ii. If both forging units are included, approxi-mately_ 670,450.00
24. On August 13, 1941, the Projectile Section prepared a memorandum to the Chief of the Bureau of Ordnance, requesting permission to negotiate a contract with plaintiff for the construction by the plaintiff of the forging and machine shop under a Government-ownership contract. After setting forth the contracts held by plaintiff, this memorandum continued as follows:
2. In none of these negotiations was any mention made of any increased facility to be financed by the Government. However, it has been understood from the beginning that the Texasteel Company did not have sufficient capacity in its present plant and an expansion would be required. The Company planned to do this expansion with its own funds and those obtained through an EFC loan. Preliminary negotiations with the EFC had indicated that such a loan would be granted. When the matter of the loan was taken up for final settlement, the conditions imposed by the EFC were such that the Texasteel Company did not feel that they could meet them without tying up all of their assets. All negotiations were directly between the EFC and the Company, as no help was requested from either the Navy or the Office of Production Management. Now that an adverse decision has been made, it is not believed that this situation can be changed immediately.
3. Based on the understanding that they would obtain these funds, this Company has ordered all of its equip *334 ment for a new steel plant to make 6" square shell steel billets, a forging plant and a machine shop. The majority of the equipment is second-hand but in good condition, and it includes certain pieces of equipment from the Naval Ordnance Plant, South Charleston, such as two 30-ton electric furnaces. A careful survey of the situation regarding ability to get sufficient shell steel forgings, particularly in the Southern section of the country, made it apparent in the opinion of this Section that an expansion of this material was necessary, and that this place was the best one to put it, in view of the experience of the Company, in manufacturing, high grade steel for oil well supplies and their execution of an Army contract for 155 mm. shells.
4. The present situation is that the Texasteel Company has agreed to build a steel producing unit and mill at its own expense. They have submitted a report of this nature to the Office of Production Management, and are requesting a Certificate of Necessity. The product of this mill would supply shell steel billets for the Navy orders mentioned above, and for certain Army orders which that Company has, plus a small surplus, and the plant would be so arranged that its capacity could be regularly increased if the need arose.
5. The above expansion would utilize all available Company funds and is estimated at about $2,000,000. The Company, therefore, has requested the Navy’s assistance in a Government ownership contract to cover the equipment in the machine shop and the forge shop at a total cost of $395,125. The items covered are listed on the enclosures to the attached letter. If the facility contracts carry a rental of $1.00 a year, the Company stated that a rebate of $74,085.94 would be allowed on the current Navy supply contracts, which would be in process in this shop for nine months, which is based on a 25% rental. In addition to the above, the Company has agreed that it will reduce the price of projectiles at a difference in amount between the cost of shell steel billets purchased in the Pittsburgh area and delivered in Texas, which were the figures used in computing their prices, and the current price of shell steel billets in Texas when their mill gets in operation. The Navy orders will require 13,300 tons of billets. It is estimated that the reduction in price should be at least $10.00 per tom
6. In view of the financial considerations given above for reduction in price in the projectile contracts, the need for a capacity for forging and machining projectiles which will be immediately available, and the ap *335 parent need for further shell billets, it is recommended that the Bureau of Ordnance accept the offer of the Texasteel Company made in their letter of 12 August 1941 as outlined above, and modify the supply contracts accordingly. The Bureau of Ordnance will only he concerned with the forging and machine shop, as the matter of the mill will be handled entirely by the Company. However, in view of the general steel expansion, the matter has been referred informally to the Office or Production Management and, in the opinion of Mr. Hooker, the need for the new forging unit appears definite and the requirements for the mill will be further studied by the Office of Production Management. This matter does not concern the Bureau of Ordnance, except as a related matter in permitting price reduction for the difference in steel prices due to lack of freight charges. In view of the fact that this machinery is now all on order, it will have to be cancelled immediately if such action is not to be taken by the Bureau.
7. It is believed that a decision should be rendered as promptly as possible after a full review of the facts by all interested parties.
25. With respect to the steel mill which plaintiff proposed to build at Port Arthur, an application for a loan was made to RFC. The RFC took the position that plaintiff was financially over-extended, and informally stated conditions which plaintiff considered unduly onerous. In October 1941 plaintiff submitted to the Navy a proposition that it reimburse plaintiff for all expenditures made to date on the steel plant, complete it, and turn it over to plaintiff for operation in consideration of a further reduction in the price of shells. The Navy rejected this proposal, but on October 31, 1941, the Under Secretary of the Navy signed a letter to the Office of Production Management recommending that it approve plaintiff’s expansion program. A survey of the plant, then in process of construction, and of its plans, was made by a representative of OPM, which gave tentative approval to the project in a letter to Defense Plant Corporation dated December 3,1941. The matter was investigated by Defense Plant Corporation, which on January 19, 1942, declined to enter into the project. Plaintiff again requested the Navy Department to give the RFC a guarantee of at least part of a loan for the steel plant. The Projectile Section recom *336 mended against this action, and the evidence fails to disclose that any action was taken on it. Plaintiff continued to press for favorable action on its application until at least February 21,1942. On January 21,1943, the Navy authorized the sale by plaintiff of the steel mill equipment which plaintiff had purchased from the Navy.
26. On August 20, 1941, plaintiff’s general manager met with representatives of the Navy Bureau of Ordnance to negotiate the details with respect to financing by the Navy of the forge and machine shop. Little was accomplished on that day, since plaintiff had not yet received complete plans from the Beyster Corporation, the organization which it had retained on May 19, 1941, to prepare plans (see finding 9). The meeting reconvened the following day, with Mr. Beyster and a second representative of plaintiff in attendance. At this meeting Mr. Beyster produced plans for an integrated plant, i. e., a steel mill and a forge and machine shop in a single building, as plaintiff had originally contemplated building them. Plaintiff’s existing arrangements with Beyster and with the construction firm which had been employed were on a percentage-of-cost basis, which the Navy-refused to approve. Flat fees were negotiated for each of these concerns. These fees, plus an allowance of $55,500 for contingencies, were added to plaintiff’s cost estimate, and a total contract price of $550,000 was thereby computed. Thereafter, on September 5, 1941, the plaintiff formally requested approval by the Navy of the plans and specifications prepared by Beyster for the erection of the forge and machine shop as well as authority to enter into subcontracts with Beyster and the proposed building contractor. Navy approval was promptly given upon each request.
27. Under date of October 6,1941, the Chief of the Bureau of Ordnance requested authority from the Secretary of the Navy to negotiate a facilities contract with plaintiff. This request read in part as follows:
2. Contractor contemplated an expansion in its forge and machine shop facilities, steel heating and treating facilities, at its own expense, to be financed by means of a loan from the Reconstruction Finance Corporation. Difficulties have arisen and Contractor is unable to obtain the necessary financing. -
*337 3. Due to a shortage in forging facilities in the country at large, and in the southwest in particular, it is believed to be in the interest of national defense to have additional forging capacity available for present and future national defense needs. If the proposed expansion is not made, Contractor will be unable to deliver. Existing forging capacity is taxed to the limit.
4. Accordingly, it is certified that this Bureau finds it impossible to make contracts or to obtain facilities to effectuate the purposes of Public No. 671, 76th Congress, and more particularly Section 8 (b) thereof, in the procurement of projectiles, except in. the manner contemplated by said Act. It is recommended that the Secretary of the Navy so find and determine.
5. The Contractor has agreed to reduce the price of the supply contracts by an amount equal to twenty-five percent of nine-twelfths of the cost of the facilities, which amount, it has been determined, the Contractor has included in the cost of the supplies as interest in the proposed investment and normal depreciation, wear and tear had the Contractor provided the facilities itself. This amount is $103,125.00 The total deduction will be made in contract Nord-171 by means of a change letter therein.
6. The Contractor further has agreed to reduce the price of supplies in the existing supply contracts by any savings in the cost of steel over $72.00 a ton, which will be occasioned by the proposed expansion. This agreement is being made effective by change letters in existing supply contracts Nord-150, Nord-153 and Nord-171.
7. The expansion will be by means of a Government-ownership contract at true cost without profit or fee to the Contractor. Contract will provide for competitive bidding where practicable and for approval of all purchases by the Chief of the Bureau of Ordnance. Accordingly, it is certified that the cost of expansion is fair and reasonable, and it is recommended that the Secretary of the Navy so find and determine.'
Such authority was granted the same day.
• A true cost without profit facilities contract was entered into between the parties under date of October 14, 1941. This contract, NOd-2350, is in evidence as a part of plaintiff’s exhibits 30 and 30A, and is hereby made a part of .these findings.. It provided immaterial part as follows:.
' Whereas, Section 8 (b) of the Act of June 28',; 1940 (Public No. 671, 76th Cong., 3d Sess.), entitled “An *338 Act to Expedite National Defense, and for Other Purposes”, provides that whenever the Secretary of the Navy finds it impossible to make contracts or obtain facilities to effectuate the purposes of this Act in the procurement or construction of items authorized in connection with national defense he is authorized to provide, out of appropriations available to the Department for such purposes, the necessary buildings, facilities, utilities, and appurtenances thereto on Government-owned land or elsewhere, and to operate them, either by means of Government personnel, or otherwise; and
Whereas, the public exigency, in the national emergency declared by the President on September 8, 1939, to exist, makes it necessary in the judgment of the Secretary of the Navy that the production of projectiles for purposes of national defense be expedited and that additional machine tools, equipment, facilities and appurtenances be provided at the plant of the Contractor; and
Whereas, pursuant to the aforesaid provisions of the Act of June 28, 1940 (Public No. 671, 76th Cong., 3d ■Sess.), the Secretary of the Navy finds it impossible to obtain facilities required to expedite the production of the aforesaid projectiles, except in the manner contemplated by that statute and as hereinafter provided; and
Whereas, the Department and the Contractor have entered into or are entering into further contract or contracts, hereinafter sometimes referred to as “the supply contract”, for the sale by the Contractor to the Department of projectiles or other ordnance materials on the understanding that the facilities required for the production of the same will be provided by the Department; and
Whereas, the Contractor represents to the Department that the price to be paid to the Contractor under the supply contract or under any other contract will not include any amount or allowance for the cost of acquisition, construction or installation or for the amortization or depreciation of the said facilities, other than rental; and
Whereas, the Contractor represents that the land upon which the facilities are to be located, an[d] adequate legal description of which is incorporated in Appendix A hereof, is the property of the Contractor and is not subject to any lien or encumbrances except such as are not required to be removed by the Contractor; and Whereas, the necessary funds are available for the purposes of this contract under the appropriation “In *339 crease and Eeplacement of Naval Vessels, Armor, Armament and Ammunition”;
‡ ‡ $
Article 1. Scope of Contract. — The Contractor shall with due expedition, by contract with others or otherwise, acquire and install or construct the machinery, equipment, facilities, services and appurtenances identified in Appendix A attached to and forming a part of this contract (and hereinafter sometimes collectively referred. to as “the facilities” or “the Department-owned facilities”), furnishing or causing to be furnished the labor, materials, tools, machinery, equipment, facilities, supplies and services, and doing or causing to be done all other things necessary for the acquisition, installation and construction thereof. All of the said facilities shall be in accordance with the drawings, specifications, descriptions and instructions set forth in Appendix A.
Article 2. Limitation of Cost. — It is estimated that the total cost to the Department of the facilities hereunder will not exceed Five Hundred Fifty Thousand Dollars ($550,000.00) unless as a result of approved changes therein a larger sum is approved by the Department, represented for that purpose by the Chief of the Bureau of Ordnance, and that such facilities will be ready for utilization by the Contractor within four (4) months from the date of this contract. It is expressly understood, however, that the Contractor does not guarantee the correctness of either of these estimates but will use its best efforts to acquire, install and construct said facilities in accordance with these estimates.
. Article 3. Approval by the Department. — In addition to the plans, specifications, lists of machinery and equipment and estimated costs already approved by the Department prior to the date of execution of this contract the Contractor shall, as soon as practicable, prepare and submit for approval by the Department, represented for this purpose by the Chief of the Bureau of Ordnance, such additional detailed plans, specifications, lists of machinery and equipment and estimated costs covering the items described in Appendix A hereof and conforming to the estimated total cost stated in Article 2 hereof, as the said Chief of Bureau shall require. After obtaining such approval, the Contractor shall promptly proceed to acquire and assemble the necessary materials and equipment required to erect and install the items described in Appendix A hereof in accordance with the approved plans and specifications gov *340 erning the same and shall diligently prosecute to completion the work of construction, erection and installation of such items. Where practicable, it shall obtain from responsible firms or individuals, competent to furnish the material or equipment or to undertake the work involved, competitive bids for all material, equipment or services required and shall make award to the lowest satisfactory bidders; provided, that as a condition precedent to any award as aforesaid, the Contractor shall obtain the approval of the Chief of the Bureau of Ordnance or his authorized representative; and provided, further, that the sum of all costs incurred by the Contractor in the performance of this contract shall in no event exceed the sum of the maximum total estimated cost set forth in Article 2 hereof, unless such total estimated cost shall be increased in accordance with Article 5 hereof.
‡ ‡ ^
Article 6. Detennvnation of Costs:
(a) The true cost to be paid by the Department shall be determined by the Compensation Board, and the decision of such Board or a majority thereof shall be binding on the parties hereto. In determining such true cost the Compensation Board shall, subject to the provisions of this Article, employ the accounting methods for determining costs as set forth in the Eegulations promulgated by the Treasury Department and approved by the Secretary of the Navy August 6, 1940 (T. D. 5000, as amended).
(b) The true cost of the facilities provided for hereunder to be paid by the Department shall not include any profit to the Contractor.
(c) The Contractor shall, to the extent of its ability, take all cash and trade discounts, rebates, allowances, credits, salvage values, commissions and bonifications available to the Contractor, and if unable to take advantage of any such benefits it shall promptly notify the Department in writing to that effect and the reason therefor. In determining the net cost of articles and materials of every kind require[d] for the purpose of this contract, there shall be deducted from the gross cost thereof all such cash and trade discounts, rebates, allowances, credits, salvage values, commissions and boni-fications which have accrued to the benefit of the Contractor or would have so accrued except for the fault or neglect of the Contractor. Such benefits lost through no fault o[r] neglect on the part of the Contractor shall not be deducted from Gross Costs.
*341 (d) The true cost of performance of this contract shall in no event exceed the sum of the total estimated costs of all items identified in Appendix A hereof, unless such total estimated costs are revised in accordance Avith Article 5 hereof.
* * * *
Article 8. Payments. — (a) The Contractor shall be paid without profit as full compensation under this contract the true cost of performance thereof, said true cost being determined in the manner provided in Article 6 hereof.
‡ ‡ #
Article 23. Disputes. — Except as otherwise specifically provided in this contract, if any doubts or disputes arise concerning any question hereunder or as to anything in the plans or specifications, or if any discrepancy appears between said plans or specifications and this contract, the matter shall be referred at once to the Secretary of the Navy for determination; and his decision in the premises shall be conclusive and binding upon the parties hereto. In the meantime, the Contractor shall diligently proceed with the work as directed.
* * ífc 5H
28. Contract NOrd-171 was amended by a change order which was issued by the Navy on October 4, 1941, and accepted by the plaintiff the same day, as follows:
When the above identified contract, NOrd-lYl, was entered into, the Contractor contemplated procuring the steel from external sources, and installing certain facilities with its own, or borrowed, funds.
Due to difficulties in financing, the Contractor has requested this Bureau to provide additional forging facilities by means of a Government ownership type of facilities contract. It is the opinion of this Bureau, based on investigation, that a shortage in forging facilities exists particularly in the southwest, and that an expansion in these facilities is necessary in the interest of National Defense. The estimated cost of the expansion of facilities to be the subject of a Government ownership contract is $550,000.00.
In view of the fact that the price under Contracts NOrd-150, NOrd-153 and the above identified contract-was fixed in contemplation of the Contractor supplying its own facilities, it was agreed between the representatives of the Contractor and the Bureau that the Contractor would decrease the cost of the supplies to be *342 furnished under Contracts NOrd-150, NOrd-153, and NOrd-171 by 9/12 of 25% of the estimated cost of the facilities, or $103,125.00.
For the purpose of convenience, this decrease will be borne, for all three contracts, in Contract Nord-171.
Furthermore, the contract price was based on the price of steel at $72.00 per ton. Due to the placing of the facilities in Port Arthur, there will accrue certain savings in freight. Accordingly, the difference between $72.00 a ton and the weighted average price at Port Arthur, Texas, of the same quality of Government inspected steel will be refunded to the Government.
Due to the delay which will be occasioned by the acquisition and the. construction of the facilities, the time within which deliveries are to be completed is extended from July 1942 to October 1942.
Accordingly, pursuant to Article 16, Changes, of said contract, it is desired that the above identified Contract NOrd-171 be amended as follows:
(1) On the title page (1), change the numeral following the word “amount” from “2,987,500.00” to $2,884,375,00.
(2) Page 2, Article 1: Line 9, add the following sentence: The amount to be paid to Contractor shall be reduced by the sum of $103,125.00, and such sum as determined by the Board on Changes to represent a reduction below $72.00 per ton in the cost of steel to the Contractor!
Line 13, change “July 1942” to October 1942.
If the foregoing is acceptable to you, please so indicate on the enclosed three copies of this letter, returning the same to the Chief of the Bureau of Ordnance, thereby incorporating, embodying and including said changes as a part of said Contract Nord-171.
Change orders were also issued on contracts NOrd-153 and NOrd-150, reducing the total contract price to the extent of any reduction in the cost of steel to the plaintiff below $72 per ton. The time for completion of NOrd-153 was extended from July 1, 1942, to October 1, 1942.
29. Work on the shell plant started on October 22, 1941, when the Navy’s resident inspector arrived on the job. During the course of construction, because of changes contemplated in the steel mill which plaintiff desired to put on the same site, it moved the location of the Navy *343 building and changed the type of roof construction, without prior consultation with the Navy. A change was also made in the location of the accumulators for the hydraulic presses, putting them farther away from the Navy building. This matter came to the attention of the Navy, and after conferences with plaintiff and with representatives of the Beyster company, which had made the changes at plaintiff’s direction, the Navy approved them. During the course of these discussions, plaintiff’s general manager stated that plaintiff would bear all costs of moving the building, and pointed out that plaintiff had the responsibility under the facilities contract of supplying transportation facilities, and that plaintiff would therefore bear any excess costs of the railroad siding occasioned by the shift of location.
The Navy also approved, on December 16,1941, changes in the electrical wiring layout of the building occasioned by the changes in location and design.
30. Meanwhile, the plaintiff had been going ahead with the erection of a steel mill. It had used funds which had been furnished as advance payments on contracts NOrd-153 and NOrd-150 for this purpose while seeking Government financing for the erection of the steel mill. Many discussions were had between A. J. Armstrong and various officials of the Eeconstruction Finance Corporation and the Office of Production Management. On December 3, 1941, W. A. Hauck, steel consultant at the latter agency, wrote a letter to W. D. Allen, steel consultant, Defense Plant Corporation, in which he described a program of expansion proposed to OPM by the plaintiff at Port Arthur. The plant was described as a plant for shell billet steel at an estimated cost of slightly over a million and a half dollars.
The letter concluded as follows:
The above program in general is favorably considered and being analyzed by us. If we find it in order, it is our intention to certify its necessity in ou[r] National Defense Program, approve it and recommend it to the consideration of the Defense Plant Corporation for Government financing.
In the meantime it is our suggestion that you confer direct with the company on financing arrangements and advise us of any changes necessary to meet your re *344 quirements or which you think will improve this program-.
Copy of this Tentative Approval is being sent to the above company.
31. On December 15, 1941, the plaintiff advised the Navy that barring unforeseen contingencies the shell plant would be ready for operation during early February 1942. The letter also discussed the status of the steel mill and concluded:
Of greatest importance at the moment is prompt and favorable action on the part of the Defense Plant Corporation.
Again on December 30 the plaintiff by telegram advised the Navy that based upon the promised delivery to it of the necessary billets and machine tools ordered, it could commence operations on the 6-inch projectiles (NOrd-150) and finish up to 40,000 finished shells by May 1942. It was stated that the delivery of 5-inch shells would be correspondingly delayed if the Navy should prefer delivery of the 6-inch shells first.
32. On January 1,1942, the Chief of the Bureau of Ordnance sent the following telegram to the plaintiff:
IN VIEW EXCESSIVE DELAYS ENCOUNTERED AND UNSATISFACTORY DATE ESTIMATED FOR DELIVERY SIX INCH AND FIVE INCH PROJECTILES REQUEST YOU REESTIMATE SITUATION ON BASIS OF SIMULTANEOUS PRODUCTION BOTH TYPES SUBCONTRACTING AS NECESSARY. FOR SPECIAL PARTS OR WHOLE ASSEMBLIES
The plaintiff replied by telegram and letter on January 2, 1942, stating that the delay was due to late delivery of' the necessary machine tools, suggesting that the Navy might bring pressure on plaintiff’s suppliers to accelerate delivery of the machine tools. The plaintiff stated that it preferred to proceed with the 6-inch shells under contract NOrd-150 ahead of the two contracts for 5-inch shells. Contingent upon the subcontracting of the machine work on 175,000 5-inch shells and also contingent upon no further delays in machine tool deliveries, as well as the delivery to it of the necessary steel billets, the plaintiff set forth the following schedule of deliveries:
*345 20,000 6"/47 Bombardment projectiles from March 15 to 'April 15, 1942. '
25,000 5" A. A. C. projectiles from April 15 to May-1,1942.
100,000 5" A. A. C. projectiles during May 1942.
100,000 5" A. A. C. projectiles during June 1942.
100,000 5" A. A.- C. projectiles during July 1942.
39,000 5" A. A. O. projectiles by August 15,1942.
Plaintiff contrasted this with, its understanding of -the schedule of deliveries under its shell contracts, in the following terms:
4. The above compares with the present schedule of deliveries under Contracts Nos. NOrd-150, NOrd-153, and NOrd-171 as we interpret the amendment of contract of October 4,1941, as follows:

The amendment of contract in this regard reads as follows:
“Due to the delay-which'will be occasioned by the acquisition and the construction of the facilities, the time within which deliveries are to be completed is extended from July 1942 to October 1942.”
. It is noted that the plaintiff’s quotation with regard to the amendment of contract should be related only to contract NOrd-171, as contract NOrd-153 then called-for complete 'delivery by October 1," 1942, and contract NOrd-150 then called for deliveries of 2,000 shells by January 1942 and 2,000 per month thereafter..
33. The Navy replied to this by telegram of January 8, 1942, reading as follows:
YOUR TELEGRAM AND CONFIRMING LETTER 2 JANUARY SUBCONTRACTS ARE ENTIRELY THE RESPONSIBILITY OF THE PRIME CONTRACTOR X BUREAU DOES NOT DESIRE TO INTERVIEW PROSPECTIVE SUBCONTRACTORS X YOU ARE REQUIRED TO EXPEDITE PRODUCTION BY ALL MEANS AVAILABLE X BUREAU WILL ENDEAVOR TO ASSIST BY EXPEDITING DELIVERIES OF EQUIPMENT AND MATERIALS.
*346 34. On J anuary 19,1942, the president of the Defense Plant Corporation advised the plaintiff that the directors of the Defense Plant Corporation declined to enter into an agreement with the plaintiff for the construction of a plant for shell billet steel at Port Arthur, Texas.
35. On January 21, 1942, George W. Armstrong, Chairman of the Board of the plaintiff, wrote the following letter to the Chief of the Bureau of Ordnance:
In confirmation of my oral alternative propositions to you this morning regarding the Port Arthur steel mill, I submit them in writing, as follows:
1. We respectfully request the Navy Ordnance Department to propose a “take out” offer to the RFC by which the Navy will assume in part the risk of financing the Port Arthur steel mill.
2. If the Navy is unwilling to do this, then we respectfully request your support of our application for a Necessity Certificate when and if we arrange for private financing for this project. I think that wé may be able to arrange for such financing promptly, particularly if the Army Ordnance Department reimburses us for our investment in equipment for making shells at our Fort Worth plant. I enclose, you a copy of letter to Senator Henderson on that subject.
3. That in case we are unable to finance the Port Arthur proposition, that you consent to our sale of the equipment that we bought from the Navy Department. We have assembled at Port Arthur practically all of the equipment needed for a modern steel mill.. We bought it all cheap; it is in good condition, and if we are permitted to sell it as a whole we should be able to close it out without loss.
4. That you consent to the partnership firm of Armstrong & Company taking over the shell contracts and assuming the obligation of filling them. Our proposition to the RFC is made upon behalf of Armstrong & Company, as you will note from my letter to Senator Henderson.
I anticipate that if we should undertake private financing it will be necessary to organize this partnership, and to do so on behalf of the partnership, as it will put three or four million dollars’ worth of assets behind our obligation. It seems to me that it is desirable, from the Navy’s standpoint as well as our own, that the firm that owns the Port Arthur mill should also be obligated on the shell contracts.
*347 I did not think to mention this latter subject to you this morning. If you wish to discuss it or any other subject with me, please ’phone or write me at Room 416, Willard Hotel. In the event you write me after Friday, please address me at Woodstock Plantation, Natchez, Mississippi, sending a copy of your letter to my son, A. J. Armstrong, Texasteel Manufacturing Company, Fort Worth, Texas. The enclosed copies of letters relate to the subject we discussed this morning, and I assume may be of interest to you.
Thanking you for your courteous hearing, I am
36. Although there is no evidence that the Navy replied to the above-quoted letter, the proposals made therein were discussed within the Bureau of Ordnance and were discussed • with representatives of the plaintiff as will be hereinafter set forth.
37. On February 10,1942, the Chief of the Bureau of Ordnance sent the following letter to the Seaboard Surety Company with a copy to the plaintiff:
Your company is the surety on the performance and advance payment bonds of the Texasteel Manufacturing Company under Contracts NOrd-150 and NOrd-153, and the surety on the performance bond of Contract NOrd-171.
It now appears to this Bureau that the ability of the company to perform its contracts with this Bureau is in serious question. Under Contract NOrd-150 deliveries are already in default.
This Bureau wishes to call your attention to the situation in advance, in order that you may be advised and take such steps as you consider necessary.
38. On February 11, 1942, representatives of plaintiff and of the Navy Bureau of Ordnance met at Washington to discuss the situation existing under plaintiff’s contracts. Plaintiff’s general manager stated that the buildings for the forge and machine shop were completed, that most of the forging equipment had been received and installed, that delivery of the machine tools was promised for February and March, and that plaintiff planned to start production in March, and wished to complete deliveries of 6-inch shells before starting on the 5-inch contracts. There was also some discussion of the steel mill, plaintiff’s general manager stating that all *348 work on it had ceased, but that plaintiff was still hopeful of securing WPB assistance to complete it. The Navy representatives reemphasized their position that the Navy had never undertaken and would not undertake any financial backing or responsibility for the steel mill, its sole interest .being to secure shells from the shell plant. They also stated that they did not feel that there had been any criminal or other reprehensible action on plaintiff’s part in using funds advanced under the supply contracts to finance the steel mill, but only bad judgment, and that the Navy had gone along with such expenditures because of plaintiff’s representations that it had a commitment from the EFC to finance the steel mill, which would have permitted the replacement of these monies.
Discussion was had of plaintiff’s financial position, it being determined that it had inadequate working capital to perform its production contracts with the Army and the Navy. Plaintiff’s general manager stated that it planned to secure part of these funds by the sale of certain tools at Fort Worth to the Army, and to secure the balance by borrowing $900,000 on contract NOrd-171, on which it had not received an advance payment. It was pointed out to plaintiff that the necessity of repaying the advances already made and the necessity of repaying such additional advance payment out of funds received under the Navy shell contracts, would continue to keep it in a precarious position for working capital.
39. On February 26¿ 1942, an official of Seaboard Surety Company called the Chief of the Production Division of the Navy Bureau of Ordnance on the telephone, and advised him that plaintiff had experienced difficulty in arranging a private -loan on the security of contract NOrd-171. He inquired ■whether the Navy would be willing to make a 20 percent advance on that contract.
This advance payment was approved by the Navy on March 3, 1942.
40. In connection with an audit of plaintiff’s accounts made by a Navy cost inspector late in January 1942, it was disclosed that, out of aggregate advances of $585,844.80 made by the Navy on contracts NOrd-150 and NOrd-153, $285,335.94 had been expended for the steel mill, $89,517.39 *349 for matters relating to the Navy contracts, and $101,761.09 for general expenses of plaintiff. Plaintiff had a balance on. hand of these advances of $109,301.42.
41. Under date of March 9, 1942, plaintiff received a. written report from the Beyster Corporation, advising it that the hydraulic pumps it had on hand, being part of the equipment purchased from South Charleston, were not of adequate capacity to handle the forging equipment which, plaintiff desired to operate with them, and that additional pumps would be required which would have an installed cost of $57,354.
On the same day, plaintiff’s general manager wrote to the-Navy inspector at Port Arthur, advising him of the situation, with respect to the hydraulic pumps, and stating that plaintiff had already ordered additional pumps. He also-stated in this letter:
The other two pumps and one accumulator can be utilized for the Army shop, that will be operated at lower pressure, and the Navy will be reimbursed its-investment to date in this equipment.
It has also been determined that proper provision for-heat treating has not been made. Mr. Spengler proposed to build the furnaces from material on hand and was to have ordered the necessary accessory equipment. He left no design nor is there any record of orders for this, equipment on file. Mr. Ourand will recommend against attempting to build these furnaces. It is his opinion,, in which we concur, that it will be less expensive in the long run to have a new furnace installed by one of the established manufacture [r]s. Ten to twelve weeks will be required for this and the cost will run $40,000.00 fora single unit of 100 shells per hour capacity and double-this amount for 200 shells per hour capacity.
No maintenance tools have been provided and though we have been able to supply some tools from our Fort Worth plant, there is no doubt that there are other tools that will be needed.
There are other deficiencies in the present layout in the matter of handling equipment and in other respects, that will entail increased costs over the approved amount. Fortunately, however, it appears that nothing-will have to be scrapped and that in so far as provisions-have been made at all, the equipment on order is first class and properly selected for the character [of] work, to be done.
*350 The Kesident Inspector recommended under date of January 18, that the plant be expanded to balance the production line. This, in our judgment, is most advisable. The building, power transmission facilities, hydraulic equipment installation, furnaces and forging equipment are all designed for normal capacity output of two hundred shells per hour. The investment involved in the above and that made by the company in trackage, primary transformer station and maintenance shop and maintenance tools transferred from its Fort Worth plant, amounts to around $100,000.00. It is certain that additional money from some source will have to be expended on the accumulated system and in handling equipment and for heat treating furnaces that will exceed the $550,000.00 appropriation. * * *
The Mr. Spengler referred to in this letter was a man whom plaintiff had employed as technical assistant to the manager, with the expectation of making him superintendent of the Navy plant when it went into operation, but who had left plaintiff’s employ prior to the date of this letter. He had been more or less in charge of construction work for plaintiff.
42. On March 13 and 14, 1942, a Navy officer who had formerly been an engineer employed in plaintiff’s Fort Worth plant, made an inspection of plaintiff’s Port Arthur plant. He stated his conclusions in a written report to the Director of the Production Division, Bureau of Ordnance, in the following terms:
(1) Port Arthur, Texas, plant of Texasteel Mfg. Co. has had, until the latter part of February 1942, incompetent management and no planning or engineering
(2) Complete reorganization of management and executive personnel has been made in accordance with reference (a)
(3) New administrative and engineering force is thoroughly competent
(4) The company’s operations have been handicapped by lack of adequate funds
(5) It is believed adequate funds are now available for successful operation of the Port Arthur branch of this company
(6) Texasteel can produce Navy projectiles more quickly than any other company could by taking plant over now. It is believed five (5) or six (6) months will *351 be required to get into satisfactory production on finished projectiles. It is believed projectile forgings can be produced in about ten (10) weeks.
(7) It is estimated that $300,000 to $500,000 additional will be required for facilities from the Bureau of Ordnance
(8) Company will submit to Bureau of Ordnance by 1 April 1942 complete information in regard to additional facilities required and additional time required to make deliveries under contracts NOrd 150, NOrd 153, and NOrd 171
(9) Present Navy inspection will be unsatisfactory because of prejudice. Navy inspectors should not have to supply engineering for a contractor but in this case considerable delay would have been avoided had Inspector been able to check deficiencies in production setup. It is believed that Navy Inspector at Port Arthur plant of Texasteel Mfg. Co. must be more aggressive; must have ability to see that all equipment is properly selected, installed, and tooled up, and that no further omissions are made; and must have authority and ability to dictate and force positive action, should that become necessary, on any matter of interest to the Navy. In this connection, no criticism whatever of inspection force was made by the company and the new Port Arthur management is considered capable and reliable but considerable help could be given by an aggressive, well informed inspector and any possibility of further delays or mistakes could be eliminated.
He recommended that the Navy provide additional facilities for plaintiff, estimating their cost at from $300,000 to $500,000.
43. Shortly after this, the plant was inspected by another Navy officer whose report, dated March 17, 1942, stated in part as follows:
2. The physical conditions at this plant are as follows:
A narrow shell paved road, in bad repair, leads from the main road to the plant, distance about one mile. There is no other access except the barge canal and a new railroad siding. The surrounding ground is swampy and the road is sometimes covered by water in rainy weather. The ground around the plant is also marshy and impassable in wet weather. Soil is gumbo and rarely dry except on the surface. Parking facili *352 ties are poor as cars must be parked on shell or other paving. Access to the plant is poor and may be impossible in wet weather.
Work at the plant has almost ceased. A few riggers are at work erecting presses. No access conduit was installed thus requiring concrete to be drilled out while trenches are dug for electric conduits. There appears to have been little planning done before the building was erected.
No crane service has been provided except one caterpillar crane. The railroad siding is some distance from the building. The barge canal is still further away. Incoming steel billets must be transported by this single crane to the center of the shop and then transported to the far end for first heat. No roads are built from siding or canal to shop. There are no overhead cranes or any system yet designed to handle billets. A gravity feed was projected but has not yet been worked out.
The machinery line is not placed and some of the machinery has not yet been received. No effort has been made to overhaul lathes received from the Navy and tooling has not begun.
No work has been done on the accumulator system except the concrete bed. Here the holding down bolts had been laid out wrong and were drilled out of the concrete. They have not been reset. No one has figured out performance data on these accumulators and it is doubtful if the system will work even if installed perfectly due to the fact that lines to the Army shop will take pressure first from lines leading to the Navy shop. Accumulators should have been installed between the two-shops. • ■
Although a dike has been built around the plant, it appears that the water level may rise in this area far-above the floor of the plant when heavy rains or extra high tides occur. There is little natural drainage as the ground is only a foot or two above water level in the canal.
A representative of the architect informed me that this site was chosen because of the proximity to markets of the world via barge canals. There appears no other reason in the world why such a site should have been chosen: During the summer months mosquitos are reported so thick in this area that little work can be done.
3. The estimated date of starting production is governed as follows:
There appeared to be no plan available that showed the layout of the completed plant. The H. E. Beyster *353 Corporation of Detroit, Michigan, was paid a large fee when completed plans were approved by the Navy De-. partment. I could find nothing that appeared to be a working drawing of the plant. Consultation with the Beyster representative disclosed that other representatives of that company had left to investigate other installations and then for consultation at the Detroit office. It is believed that they intend to work out competent procedure for finishing the plant and placing it in operation. It is believed that the entire job must be re-engineered before further progress can be made.
*****
5; It is recommended that no further funds be made ^available until the H. E. Beyster Corporation submits a ■complete engineering plan of the proposed plant as required under their contract. To spend more money until such plans are approved might well prove extremely wasteful. The new demands for additional costs might prove higher than warranted by results that may be expected.
44. Under date of March 23, 1942, the Resident Inspector ■of Naval Material at the Port Arthur plant advised plaintiff that it had spent or obligated funds to the $550,000 limitation of the facilities contract, and that he would be required to withhold approval of any further expenditures under that •contract.
45. On April 1, 1942, plaintiff submitted to the Navy an ■estimate prepared by Beyster, indicating that $860,146 of additional facilities would be required to put the plant into ■operation. On April 3, a conference was held in Washington between representatives of plaintiff and of the Bureau of Ordnance. It was pointed out by Navy representatives that the revised plans were generally comparable to similar installations elsewhere, but that the total cost of this installation would be excessive, since comparable lines had cost between $700,000 and $1,000,000. One Navy representative was emphatic in his position that plaintiff did not have the ability to engineer or operate this facility properly, and that it would be very unwise for defendant to furnish additional funds under the facilities contract so that its total investment would be $1,000,000, the top cost of a comparable line elsewhere, but plaintiff’s general manager stated that plaintiff would not be.in a position to advance the remaining $410,146. *354 The meeting adjourned without reaching a decision, the various alternative courses available being (a) to grant plaintiff the full additional amount requested, or (b) to grant plaintiff the full additional amount, but with a provision that plaintiff repay out of profits on the shell contracts the advance in excess of $1,000,000, or (c) that defendant cancel plaintiff’s supply and facilities contracts, remove the Government-owned material at Port Arthur, and put it in a new plant elsewhere, at an estimated total cost, including the loss on non-recoverable items at Port Arthur, of $1,050,000.
46. Shortly after the meeting described above, a representative of Seaboard Surety Company called at the office of Mr. W. Randall Compton, counsel to the Bureau of Ordnance, and left with that official copies of certain agreements which had been executed on March 28, 1942, granting to Seaboard certain rights, powers and privileges as a condition to the issuance of additional bonds by the surety company which bonds were later issued to the plaintiff. One of these agreements, executed by the stockholders of both plaintiff company and Texas Steel Company, pledged all shares of stock in both companies to Seaboard granting a pledgee’s lien to Seaboard for the purpose of saving Seaboard harmless from liability or loss under any bonds it had issued or would issue in consideration of such agreement. This agreement contained the following provision, among others:
3. Upon the happening of either of the following events, to wit:
(a) The United States Government or any Branch, Department or Agency thereof, declaring a default in any of its contracts to which said bonds relate, or calling upon said Surety Company for performance under any of said bonds; or
(b) In the event that the United States Government, or any Department, Branch or Agency thereof, shall advise the Seaboard Surety Company that a change in management, supervision or policy of said Texasteel Manufacturing Company or Texas Steel Company is necessary in order to obviate the declaration of a default by said Government;
then in either of said event, said Seaboard Surety Company may, at its option, assume full authority and right to vote said stock in either or both of said Companies, *355 at all stockholders’ meetings which may be held — regular, called or special — and in so voting said stock, may elect officers and directors and otherwise exercise in full a stockholder’s right to direct the affairs and business of each of said corporations. Said Seaboard Surety Company may, by any letter or instrument in writing, signed by any of its Vice-Presidents, designate an Agent or proxy to vote said stock at said stockholders’ meeting, with full authority to change said Agent or proxy from time to time by similar letter or instrument. The authority to vote said stock, as herein granted, is not to be restricted or in any way limited because Seaboard Surety Company does not at that time have physical possession of said stock, and in the event that Seaboard Surety Company’s right to vote the stock is in any way obstructed or interfered with by either of said Companies, their officers, agents, directors or stockholders, then Seaboard Surety Company shall have the right to furnish a written statement of such obstruction to said Bank and thereupon immediately receive said stock, and irrespective of whether said stock is in physical possession of said Bank, or in the possession of the Seaboard Surety Company, it shall, until final foreclosure hereunder or the final termination hereof, remain subject to this pledge.
The other agreement was executed by the plaintiff and Texas Steel Company and was ratified and confirmed by all the stockholders of both companies. It limited the compensation payable to the officers of the plaintiff, gave Seaboard the right to have an auditor who would keep it informed of the plaintiff’s affairs, particularly in relation to its financial condition, and it gave Seaboard the right to have a representative present at all meetings of stockholders or the board of directors.
The Seaboard Surety Company representative advised Compton that the Surety would exercise its powers under the pledge-escrow agreement in accordance with the Bureau’s wishes.
47. About the same time the Bureau of Ordnance received another report covering an inspection of this plant, this report having been made by a Navy officer attached to the Production Division. In his report he stated:
5. The Forge and Machine Shop itself is partially completed. But the security of the present foundation *356 upon which it rests is a mystery. The ground upon which it stands is a low marshland. Floods are reasonably to be expected and in several places a three foot protective embankment exists. But far more serious is the fact that the surface earth is only two feet deep. Below that is six feet of “gumbo” and eight feet down there is firm clay. The heavy machinery of the plant is really floating on a large slab of concrete (approximately 50' x 15' x 12"), probably unsupported, although Pr2 advises that the contract calls for supporting pilings. It may be that the presses and some of the heavy machinery are supported upon pilings, but it seems certain that there are no pilings beneath the Witter Mill. Why such an important engineering factor remains in doubt is unknown to the writer and it would seem that no intelligent move can now be made until it is definitely ’known whether pilings are necessary and, if so, do they •exist. If they are necessary and do not exist, it must he determined whether settling of any part of the plant is to be expected and whether the vibration which is 'bound to occur when the mill is in operation will affect any of its parts. For example, the coupling between 'the driving motor and the reduction gears is thought to be rigid. Here again is a strange uncertainty about a •simple and important engineering fact. If this coupling 'is not flexible, and if the mill should settle unevenly or if 'the vibration should be serious, the driving shafts might ’be pulled out of alignment.
6. Even if the plant foundations are satisfactory, the plant processes are vague even in the minds of the man-' agement. ' For example, it is proposed that the steel billets will arrive by canal to the company’s loading slip, and transported from the slip to the Forge and Machine 'Shop. But just how this transportation is to be effected is uncertain. It is suggested by the management that a -derrick truck would first be used and afterward an over'head. mono-rail-trolley conveyor would be installed. Upon arrival at the forge, the bars (approximately 10 feet long and 6 inches thick) will be broken (nick and break) into billets for individual projectiles or into lengths long enough for two or three projectiles. But :again the management is vague; no hacksaws or other -cutting tools are available' and the nicks may be burned by an acetylene torch which is considered unsatisfactory by 'Captain Adams. .
7. Two gas furnaces, for heating the billets for forging ■ have béen' installed, with gas connections already made. *357 If the steel bars shall be broken into lengths longer than, individual projectiles, the company proposes to cut them, into single projectile lengths by hot saw; but this implement has not yet been ordered. After heating the billets-are to be pierced on the forge press and it is in the shop,, but unassembled. After piercing the billets are to be; forged on the Witter Mill and cooled on the floor, but. when protection from drafts was mentioned no provision, for same nor the necessity for it seemed to be understood. The Witter Mill itself has been erected and is-ready to operate when electric connections are made. Under this mill, which is the heaviest of the machines,., .it is certain that no pilings exist. However, the firm which owns and installed the mill has guaranteed its foundations and are backing their judgment by making-payment of 80% of the contract price contingent thereon.
8. After forging the projectiles will be centered,, rough machined and annealed in furnace. However: the centering machine has not been erected and no machine lathes are in the plant (except several “hospital’*' lathes owned by the company for repair work); the-annealing furnace has not even been ordered and it has-been said that it will require four months to obtain a suitable furnace from the manufacturer; and the writer-heard the contractor’s president suggest that the machining might be farmed out by the company to the-American Manufacturing Company in Fort Worth— but when that company was tactfully sounded on this-question, they stated that they were in no position to-accept such work. The shells will be nosed, dipped in-salt bath, annealed in the furnace. Then the final machining, painting, and banding. As stated, no Government-owned lathes are in the plant. Two banding machines are present but not installed.
9. In conclusion, the plant may fairly be said to be-of doubtful construction and only partially completed. Moreover, the top management is of very doubtful ability and sincerity. It was only with the greatest diificulty that any facts, harmful to the company, were obtained1 and only then with many inaccuracies, to use no harsher-word. The writer has no hesitation in saying that- he-would not himself rely upon the Mr. Armstrong with-whom he spoke in the presence of Captain Adams. In fairness to the Armstrongs, it should be noted here that another branch of their company in Fort Worth was-visited by the writer and semed to be in successful operation so far as could be ascertained from walking through. *358 the plant. It consists of a rolling mill producing steel bars for the Port Arthur plant and for Army shells which are also forged and machined in this plant. Whether they perform their Army contract satisfactorily is. not definitely known, but will be investigated further.
10. The solution of the Texasteel situation is a difficult one chiefly because engineering factors remain in doubt. The need of clear, definite, authoritative decision as to these factors is imperative. An expert on plant construction, production flow, and organization should be sent to Port Arthur for a comprehensive report; and it is believed that such an expert — theoretical and practical — could furnish such a report within a week, including travel time.
48. At a meeting of plaintiff’s directors, held on April 13, 1942', the following resolution was adopted:
On motion of E. C. Armstrong, seconded by George W. Armstrong, Jr., it was resolved that both Vice-Presidents, namely, E. C. Armstrong, Vice-President in Charge of Operations at Fort Worth, and L. C. Scott, Vice-President in Charge of Operations at Port Arthur, shall be under the direct supervision of George W. Armstrong, Jr., Secretary-Treasurer, who, in turn, shall be held accountable to the President and the Board of Directors.
The George W. Armstrong, Jr., referred to in this resolution, had been a director of plaintiff for some time, but had not become an officer until April 10,1942, when he had been elected secretary-treasurer. This change, placing him in charge of Port Arthur operations, was made because of indications of Navy dissatisfaction with the results that had been obtained by his father and his brother in the work at Port Arthur. This arrangement did, however, leave Mr. George W. Armstrong, Jr., subordinate to his brother, who was president of plaintiff and who had been general manager of plaintiff throughout the negotiations.
49. On April 21, 1942, the Navy, without prejudice to its final decision on the questions then pending on the facilities and supply contracts, authorized plaintiff to purchase a heat treating furnace and other additional equipment needed for the plant at a cost not in excess of $100,000.
*359 50. On April 22,1942, a conference was held at the Bureau -of Ordnance in Washington, attended by representatives of :that Bureau, by Mr. George W. Armstrong, Jr., and another representative of plaintiff, and by two representatives of Seaboard Surety. The surety company representatives stated that they had investigated plaintiff’s situation, had 'Concluded that George Armstrong, Jr., was competent to •operate and manage the Port Arthur plant, and had recommended placing him in charge. Mr. George Armstrong, Jr., ■pointed out that he was still subject to the supervision of plaintiff’s president (his brother), but stated that he was confident that he could produce projectiles from the plant at a satisfactory rate if given the facilities requested. The Navy ^representatives then concluded that the defendant would provide the additional $860,000 for facilities, less such amounts as could be saved by eliminating nonessential items, .that the contract would include provisions whereby plaintiff would repay to the defendant from earnings all sums paid by it on the facilities contract in excess of $1,000,000, provision would be made for supervision of construction by competent independent engineers, and a report on current conditions would be made as soon as possible by Mr. Hayes, a civilian engineer employed by the Bureau of Ordnance.
51. On April 29,1942, George W. Armstrong, Jr., on behalf of plaintiff, submitted a request for a further advance of funds under contract NOrd-lTl, so that the total advance under that contract would amount to $576,800, the maximum permitted under the contract.
52. Under date of April 26,1942, the Chief of the Projectile Section of the Bureau of Ordnance directed a request to the Director of the Production Division for permission to negotiate an increase in the facilities contract on the basis decided upon by the Navy representatives at the April 22 meeting. The Planning and Progress Section of the Production Division approved this request, and the Director of the Production Division approved it “subject to adequate surveys of the situation and the availability of the machinery required.”
53. Mr. W. E. Hayes, the engineer of the Production Division previously referred to, thereafter examined plaintiff’s *360 Port Arthur plant and submitted reports, both oral and written, of his findings. His written report reads as follows:
1. As directed by orders of 27 April 1942 two days were spent inspecting the plant of the Texasteel Manu- ' factoring Company, Port Arthur, Texas. The situation at this plant is a very deplorable one which indicates tremendous mismanagement, inability to decide upon a permanent layout, and unnecessary expenditure of funds. Much could be said in detail but would not be worthwhile in this report as it is believed that the conditions are pretty well known to the Bureau personnel directly concerned. However, the following is suggested :
(a) If the contemplated output of this plant is to be considered in the present war effort, then the equipment now installed, which includes one Witter mill and two heating furnaces together with a couple of old dilapidated turret lathes, should be removed to some plant already in operation from which production can be obtained. On the other hand if the immediate output of this plant is of no serious moment in the war effort then the additional funds necessary to carry on should be allocated and the whole operation turned over [to] the bonding company with the suggestion that proper management be installed.
(b) No matter what steps are taken to operate this plant, no production can be obtained before January or February 1943. This prediction by the writer was stated by the present management to be about correct.
_ 2. This is a very unhappy and unsatisfactory situation in which the Bureau will be paying approximately $400,000 to $500,000 more than would otherwise have been necessary had this undertaking been placed in competent hands. The cold blooded, business recommendation of the writer is that the Navy pull out from this deal, salvage what is possible, and charge the balance to profit and loss.
3. Shortly before leaving Port Arthur the Resident Inspector of Naval Material stated that he had been informed within the hour that the Army is already withdrawing from their development with this Company. This development is adjoining that of the Navy, a distance of. 40 feet,
* * * ■ * *
54. Under date of May 19,1942, the Chief of the Projectile Section addressed a further request to the Director of the *361 Production Division for permission to negotiate an increase in the facilities contract. This request read as follows:
1. Reference (b) approved the proposed increase in the subject facilities contract subject to survey of the situation and availability of the machinery required.
2. Reference (c) contains the report of Mr. Hayes, constituting the last survey of the local situation. From reference (c) it appears that although the location of the facilities and the local conditions and what has already been done under the facilities contract are not the most desirable and are subject to certain defects, the additional facilities, if ordered and installed by adequate management and operated by adequate management, will produce the required supplies within the period that supplies from this source are necessary for the Program. A meeting of the Contract Negotiation Board on 15 May 1942 concluded that in view of the above the interests of the Government would be best served and the war effort best promoted by increasing the facilities contract as proposed, provided adequate management could be insured.
3. The supply contracts and the present facilities contract are bonded as to performance, and advance payments on the supply contracts are also bonded. The total amount of the advance payment bonds is approximately $1,100,000.00. In view of this, it was concluded that the problem of insuring adequate management to complete the facilities contract as increased and the performance of the supply contracts should be placed squarely in the hands of the Surety Company acting as surety on the various bonds. It was not considered advisable for the Navy Department or the Bureau to attempt to dictate or provide management, as to do so might seriously jeopardize the contractual relations between the Department and the contractor.
4. This phase of the matter has been discussed with representatives of the Surety Company who have agreed to accept full responsibility in the premises to provide .adequate management and the performance of the supply and facilities contracts and to waive any and all •defenses which might exist as of present time to liability on the existing bonds. A letter to this effect is being addressed to the Surety Company.
5. It is recommended that upon acceptance of the proposed letter by the Surety Company the proposed increase of the facilities contract be authorized.
55. Under date of May 21, 1942, a letter was sent to Seaboard Surety Company by the Chief of the Bureau of Ord *362 nance, as contemplated by the memorandum quoted in the preceding finding. This letter is quoted in full:
Mr. O’Neill of your company and Mr. Rudolph your general counsel have attended various conferences in this Bureau and are generally familiar with the situation which exists with respect to the subject contracts, and the difficulties and delays which have arisen in connection with their performance.
It now appears to this Bureau that in order for the facilities at Port Arthur, Texas to be completed to permit the production of five- and six-inch projectiles at the rates called for by the subject supply contracts, additional equipment and facilities having an estimated cost, of $860,000 will be required.
The performance of the subject contracts up to the-present time has raised grave questions as to whether-the Navy Department should provide these additional facilities, one of the principal questions being the ability and adequacy of the management of the Contractor-
At the present time your company is surety on performance bonds on all the subject contracts and also-surety on bonds securing advance payments made under-the subject supply contract.
Before this Bureau can proceed with providing the-additional facilities and machinery, it is considered necessary that your attention be formally called to the fact, that this Bureau considers the performance of the subject contracts up to the present time unsatisfactory and5 that the additional facilities will be provided only with the understanding that the Seaboard Surety Company-will undertake to see that the management of the Contractor is adequate to carry out and perform the facilities contract as increased and to perform the supply-contracts when the facilities are available and that any- and all defenses which the surety company may have on any of the bonds referred to above existing as of the date-of this letter are waived and the surety company accepts-full responsibility and liability without regard to what has occurred up to this time under the bonds as written..
It is further understood that your company will act as surety on an additional bond in the amount of $80,000-for the performance of the facilities contract as increased and will also bond any advance payments that are necessary under subject facilities contract as-increased.
Your prompt acceptance of the understanding set forth in this letter will be appreciated in order that the- *363 Department may proceed with the increase in the facilities contract and such amendments to the supply contracts as may be necessary to extend delivery dates to a time commensurate with completion of the facilities as increased.
It is understood that you will obtain the consent and approval of your co-sureties as well.
If the foregoing is acceptable, kindly indicate your acceptance in the space provided below on this original and one copy and return same to this Bureau. The extra copy enclosed is for your files.
The surety company, by its vice president, accepted the terms of the foregoing letter on May 25,1942.
56. On May 22,1942, the Director of the Production Division forwarded to the Chief of the Bureau of Ordnance the request for authority to negotiate an increase in the facilities contract in the following terms:
1. The attached request for clearance, comments by Mr. Hayes who_ inspected the layout, and the Chief of the Armor-Projectile Section, have been reviewed by this office and the following action has been taken:
(a) The surety company has been called on and made responsible for completion of both the Facilities and Supply Contracts and will see that proper management is placed in the plant. Additional expense in the form of $800,000, approximately, will be required to obtain production.
(b) The surety company, the Seaboard Surety Com-gany, is the bonding company on both the Facilities and upply Contracts. If we do not provide the facilities the surety company will probably be able to reduce or eliminate their responsibility under the Supply Contract because we did not supply the facilities, thereby making it impossible for the contractor to carry out the Supply Contract. Therefore this office has directed the cognizant Section to proceed with the necessary facilities.
2._ There are many other factors involved in this project which will cause repercussions if we do not take this action. The city of Port Arthur and some of the private industries have invested approximately $650,000 in providing auxiliary facilities such as road, slips, power lines and transformer stations in order to get this plant into production. If it is cancelled out, there will will be considerable local repercussions with perhaps some further pressure from other sources. The plant can be gotten into production possibly by the end of *364 this year, and will fill any additional requirements for 5" and 6" projectiles which may come about through an intensive offensive campaign.
3. It is probable that the Bureau exercised poor judgment in ever starting this facility, but now that it is started and in view of the above circumstances, it is the opinion of this office that it should be completed. Your approval is requested.
'The Chief of the Bureau of Ordnance did approve the action ■requested.
57. On May 23, 1942, the plaintiff wrote the following letter to the Seaboard Surety Company. It was signed on 'behalf of the plaintiff by its president and approved by 'George W. Armstrong, Jr., secretary-treasurer.
Pursuant to our telephone conversation this morning, this letter will constitute the consent of the Texasteel Manufacturing Company for the Seaboard Surety Com-Sany to enter an agreement with the United States Navy ureau of Ordnance whereby the Seaboard Surety Company and the Texasteel Manufacturing Company will agree to waive any rights to cause of action against the United States Navy Bureau of Ordnance provided that the United States Navy Bureau of Ordnance now furnishes the funds necessary to complete the Navy Shell Manufacturing Plant at Port Arthur, Texas.
58. Under date of June 2,1942, there was sent to the Bureau of Ordnance a report made by a civilian employee of the Office of Procurement and Material of the Navy Department, relating to his inspection of and recommendations con-cerning plaintiff’s Port Arthur plant. This inspection and report was made at the special request of the Chief of the Bureau of Ordnance. The man who made the inspection ■was a civilian who before the war had been an executive of a number of large industrial concerns and whose duties had involved largely the reorganization of those concerns and of related companies. He recommended that the additional facilities be granted the company on condition that George W. Armstrong, Sr., chairman of the board, Allen J. Armstrong, president, and John Foster, financial officer of the Port Arthur plant, be removed from any positions of authority they might hold in the company.
*365 59. Under date of June 5, 1942, the Chief of the Bureau of Ordnance sent a letter to Seaboard Surety Company, reading as follows:
Eeceipt is acknowledged of your letter of 25, May, 1942, enclosing accepted original of the Bureau’s letter of May 21st.
Your Mr. T. B. O’Neill was present at a conference held by the Chief of the Bureau of Ordnance on June 2nd at which time it was proposed that Mr. G. W. Armstrong, Jr., should be made president of the Texasteel Manufacturing Company in order that his actual control of management will correspond with his office in the company insofar as the performance of the subject contracts is concerned, and that Mr. G. W. Armstrong, Sr., Mr. A. J. Armstrong, and Mr. John Foster be removed from any office which would give them any authority over the performance of the subject contracts. It was also proposed that the Board of Directors be reconstituted and that your company have a representative on the Board, that an impartial third person be added, and that Mr. G. W. Armstrong, Sr., and Mr. A. J. Armstrong be dropped from the Board of Directors.
This Bureau suggests that the changes referred to above be effected through your inchoate power under the escrow agreement covering the stock of the companies.
You are also requested to keep this Bureau advised by regular periodic reports of progress under the subject contracts and to retain a position where you can change management if future management does not appear satisfactory and future default appears likely.
60. On the following day O’Neill, who was an assistant secretary of the Surety company, called the Chief of the Production Division of the Bureau of Ordnance, to state that he had received the letter quoted above, but that, “It isn’t just the way I would like to have it.” He stated that he could foresee legal objections if he attempted to force a change of management with this letter, and suggested that another letter be written, conditioning the granting of additional facilities upon a change of plaintiff’s officers. On the same day the Navy wrote Seaboard, requesting the return of the letter of.June 5. Also on the same day, June 6, 1942, the Navy wrote another letter to Seaboard, reading as follows:
*366 By reference (a), it was required that before proceeding with providing the additional facilities and machinery referred to therein, your company would undertake to see that the management of the Contractor is adequate to carry out and perform the subject contracts. In this connection this is to inform you that this Bureau does not consider Mr. G. W. Armstrong, Sr., Mr. A. J. Armstrong [Jr.] and Mr. John Foster as acceptable persons to occupy managerial or directive offices in the performance of the subject contracts. If your company considers Mr. G. W. Armstrong, Jr., the proper person to occupy the office of the President and General Manager or other top active executive position in the Company, this Bureau offers no objection to such appointment subject to judgment on performance.
Before final authorization and approval of the additional facilities and machinery, this Bureau wishes to be advised that the Contractor has placed in effect an acceptable organization. You are also requested to keep this Bureau advised by regular periodic reports of progress under the subject contracts.
61. O’Neill went to Fort Worth promptly after receipt of this letter to discuss with plaintiff’s officers and stockholders the situation which the letter created. The initial reaction of these people was to “abandon” all of their Navy contracts, recognizing that plaintiff might incur a loss of $400,000 to $750,000 in the process. However, the surety company representative stated that he could not agree with this procedure, and that if plaintiff persisted in this position, the surety company would be forced to exercise the powers conferred upon it by the escrow agreements, in effect taking control of plaintiff and of Texas Steel Company. In the course of the subsequent discussions, the proposal was evolved that control of all operations at Port Arthur be put in the hands of a Management Committee. This proposal was accepted by plaintiff’s officers and stockholders, to avoid the possibility that Seaboard would take over these two businesses, and on June 13, 1942, plaintiff’s directors unanimously adopted the following resolution:
Resolved, That a committee of two, consisting of George W. Armstrong, Jr., T. V. O’Neill, or a committee of three, consisting of George W. Armstrong, Jr., T. V. O’Neill, and a third representative who may *367 be appointed by the United States Navy, in the event the Navy wishes to appoint a representative to act on said committee, be and the same is hereby appointed, the, members of which acting jointly are charged with full responsibility for the operation of the Company’s business' at Port Arthur, Texas, and are hereby given and granted full and complete power to act, in relation to the Company’s business and properties at.Port Arthur, Texas, for and on behalf of the Company, all action taken by them pursuant to this resolution being hereby confirmed and approved; the power-herein conferred upon them including but not being limited to full and complete power and authority to do any and all things by them deemed necessary or advisable in-connection with and to enable the Company fully to perform its obligations under the following designated contracts; with the United States Navy:
Contract NOd 2350,
Contract NOrd 150,
Contract NOrd 153,
Contract NOrd 171.
This resolution shall remain in full force and effect so long as the above designated contracts are in force and effect, provided that the same may be rescinded after, but only after such action shall have been authorized and approved in writing by Seaboard Surety Company and the Navy Department.
No representative of-the Navy participated in any way in these discussions.
62. The Bureau of Ordnance first received word of this in a letter dated June 16, 1942, from the attorney for Seaboard. Seaboard was advised by the Navy that this arrangement would'be considered satisfactory until provéd otherwise by experience.
63. Under date of July 8, 1942, the facilities contract (NOd-2350) was amended to increase the limit of cost to $1,409,455, to extend the estimated date for completion to January 1, 1943, and to provide for repayment by plaintiff of all sums expended by defendant on the facilities in excess of $1,000,000, such repayment to be made by' applying half of plaintiff’s net profits after payment of taxes, loans and advances.
The acceptance of this amendment was approved by plaintiff’s directors on July 9, 1942.
*368 64. In August plaintiff sent to the Navy for approval a revised subcontract which it proposed to enter into with the Beyster Corporation, whereby that company would be paid a fee of $30,000 for its work in redesigning the Port Arthur plant and supervising its construction. The proposed subcontract between plaintiff and the Beyster firm was approved with certain modifications not here material, and the plaintiff was duly advised of such approval.
65. At no time did the Navy appoint or suggest the appointment of anyone as a member of the plaintiff’s Management Committee.
During the summer of 1942 plaintiff borrowed $250,000 from the Whitney National Bank of New Orleans to secure funds needed for its Port Arthur plant, and in December of 1943, it borrowed a further $350,000 from the Continental Bank for the same purpose. Shortly thereafter two of plaintiff’s officers borrowed $100,000 and loaned it to plaintiff for the same purpose.
66. The plaintiff’s initial production on 5-inch projectiles under the Navy supply contracts began shortly before June 4, 1943, 500 projectiles having been accepted by the Navy on that date. No 6-inch shells were ever produced, as will be further explained in later findings. Early deliveries were credited against contract NOrd-lTl in the following quantities :
June and July-1,500
August_3, 000
September-4, 500
October_3,000
67.On September 15, 1943, the plaintiff wrote to the Bureau of Ordnance requesting that the Navy convert facilities contract NOd-2350 into a fixed price contract with an increase of $400,000 over the estimated total cost as it then stood. This request was before the Bureau of Ordnance for consideration, and on November 4,1943, the Chief of the Projectile Section, being concerned that the Navy was not receiving sufficient production from the plaintiff, recommended that the plaintiff’s contracts be cancelled and that the Government-owned equipment installed at its Port Arthur plant he moved to a plant of a manufacturer of proven produc *369 tion ability for tbe production of 5-inch projectiles. The foregoing recommendations were not adopted by the Bureau of Ordnance, nor was the plaintiff’s request for an increase in ■the amount of the facilities contract and its conversion to a fixed-price contract granted.
68. On February 11, 1944, Mr. Eudolph, who was secretary-general counsel of the Seaboard Surety Company, wrote to the plaintiff confirming discussions he had had with the four Armstrongs, George, Sr., George, Jr., Allen and E. C., concerning the reconstitution of plaintiff’s Management Committee so as to reflect changes that had already taken place in management at the plaintiff’s Port Arthur plant. The letter asked that the plaintiff take steps to reconstitute the Management Committee with E. C. Armstrong, then plaintiff’s general manager, and T. T. Alverson, then plaintiff’s division manager at Port Arthur, to take the place of George W. Armstrong, Jr., and T. Y. O’Neill. These changes were made by the plaintiff.
69. The rate of production of shells at the plaintiff’s Port Arthur plant was not satisfactory to either the plaintiff or the Navy up to June of 1944. Early in February 1944, the plaintiff submitted a proposed schedule of production to the Navy Bureau showing past production through January 1944 of 9,000 shells that month which was the highest rate it had reached up to that time, with a rising curve projected through June 1944 which would have increased production to 16,000 in February, 25,000 in March, 28,000 in April, 34,000 in May and 39,000 per month thereafter. By June 1944, the plaintiff’s actual production fell far short of its February estimate, and there were large quantities of rejects.
70. Under date of June 28,1944, the defendant gave plaintiff notice of termination of contract NOrd-150, covering 20,000 6-inch shells, with a delivery schedule of 2,000 in January 1942, and 2,000 a month thereafter, for plaintiff’s default in delivery. Plaintiff and Seaboard Surety Company replied by letter of July 6,1944, protesting this termination and requesting (a) that contract NOrd-150 be converted to a contract for 5-inch shells, and (b) that plaintiff be granted a moratorium upon the repayment advances under all of the production contracts for a sufficient period *370 to permit it to complete the establishment of a program of quality control then in process.
• 71. On July 14, 1944, the Navy approved an amendment to the facilities contract (NOd-2350) to increase the limitation of cost stated therein from' $1,409,455 to $1,477,263.68. Such amendment was accepted on behalf of the plaintiff on July 19, 1944, by its vice president, R. C. Armstrong.
72. On July 28, 1944, a conference was held at the Bureau of Ordnance in Washington for the purpose of considering the problems created by the notice of termination of contract NOrd-150 as well as the critical financial problems then facing the plaintiff. Representatives of the plaintiff stated that although they had not made a profit in any month since production of shells had begun, they were nevertheless hopeful of getting their production up to 39,000 shells per month by December 1944. Because of the plaintiff’s lack of working capital and the exhaustion of its bank credit, the only way in which it could have been able to continue in operation would have been to have had a moratorium of the amortization of the advance payments made by the Navy under the supply contracts. The plaintiff hoped that with some changes made in management and with a quality control program which was then in progress, its financial situation might improve if it were allowed to continue by the Navy’s temporarily waiving the recoupment of advance payments. The Navy officers stated that production in the plant had been highest in March, that it had fallen off progressively in April and May, and sharply in June, and that they felt that the only way the plaintiff would ever improve its position would be to sharply improve and maintain its production rate of shells since production costs of shells produced at a low rate were considerably higher than when the rate of production was increased to some point near plant capacity.
73. Subsequent to this conference the Navy representatives had a discussion among themselves, and on the following day, at a conference attended by substantially the same parties, presented their proposal. Navy representatives stated that they were prepared to grant a moratorium on the amortization of advance payments on the supply con *371 tracts to November 1, 1944, provided (a) that plaintiff produce aceptable shells during such period, getting production to the level of 32,000 shells per month by November 1, and showing ability to reach a rate of 39,000 by December 1, (b) that the surety company agree to the moratorium and reaffirm its obligation on its outstanding bonds, (c) that plaintiff establish its ability to raise sufficient working capital for the 90-day period, and the prospect of adequate financing for the balance of the contract period, and (d) that plaintiff secure “stand-by” agreements from its other creditors. The Navy further agreed to amend contract NOrd-150 to cover 5-inch instead of 6-inch shells, and to amend all of the contracts to provide for a monthly delivery of 39,000 shells, starting December 1, 1944. There was some discussion of details, in the course of which it was agreed that the amendment of NOrd-150 would be on a dollar value basis, and in which the Navy agreed, on the recommendation of the surety company, that it would withdraw the objections it had previously voiced to A. J. Armstrong and George W. Armstrong, Sr., as participants in management. One of the surety company’s representatives called attention to the fact that the reaffirmation of its obligations would be dependent upon the attitude of its indemnitors and reinsurers. Plaintiff’s representatives stated that they appreciated the recommendations of the Navy as to two individuals they had employed in managerial positions, and that they had felt no pressure to employ these individuals.
74. Immediately following this meeting, a letter summarizing the results of the conference was prepared and mailed to the plaintiff, with a copy to the surety company, on the same day. So far as here material, it reads as follows:
(7) That the surety company on your bonds consents and agrees to the amendments, including the amendment regarding moratorium on amortization of advance payments under contract NOrd-171 referred to above, and the surety and your Company restate their respective liabilities as principal and surety on all bonds executed in connection with the subject contracts without qualification or exception, as though said bonds had been re-executed and delivered de novo as of the date of execution of said amendments.
*372 75. Under date of August 14, 1944, the plaintiff, by its president, sent the following letter to the Chief of the Bureau of Ordnance:
In reply to your letter of August 7,1 am instructed by the stockholders of the Texasteel Manufacturing dompany to advise you that we are unwilling to resume the management of the Port Arthur plant and to accept a moratorium, on the following condition as stated in your memo of July 29,1944:
“(7) That * * * the surety and your Company restate their respective liabilities as principal and surety on all bonds executed in connection with the subject contracts without qualification or exception, as though said bonds had been re-executed and delivered de novo as of the date of execution of said amendments.”
We respectfully petition you to grant the moratorium without prejudice to the rights of either party. In that event we will undertake, m cooperation with the Seaboard Surety Company, to finance the operation of the plant during the ninety day period, and to establish it upon a satisfactory production basis.
I am also directed to say that while we do not consider ourselves responsible for the losses sustained during the operation of the Management Committee that was forced upon us without justification by the Navy Bureau, we are willing to accept the losses and to pay all obligations to the Navy Bureau and others, if given the opportunity to do so. We respectfully petition you to give us this opportunity.
Please be advised that we do not wish to accept the benefits of the proposed moratorium pending your consideration of this application. We will continue to operate the plant as long as possible with our limited funds.
Thanking you for a reply, I am
76. On the same date, August 14,1944, the plaintiff’s president wrote a letter to counsel in the Bureau of Ordnance in which he stated that without financial aid from some source, the plaintiff could not continue further operations at Port Arthur after August 26. With this letter was a copy of a letter of August 5 from George W. Armstrong, Sr., the principal stockholder of both the plaintiff company and Texas Steel Company, addressed to a bank officer at Fort Worth. In this enclosure the elder Armstrong explained his *373 position with respect-to losses incurred by the plaintiff company at Port Arthur. The enclosure reads in part as follows:
Succinctly stated, it is that the Seaboard is primarily responsible for the Port Ai’thur losses, and not the Texasteel Manufacturing Company or its stockholders. We agreed to this Committee operation at the request of the bond company and for its protection. Neither Allen nor I have had anything to do with that operation; and while George Armstrong was one of the committeemen, the management itself was by Mr. T. Y. O’Neill, the agent of the bond company.
When the Navy Bureau demanded the resignations of Allen and myself, and turned the operation over to the bond company, George proposed to Mr. O’Neill that we turn the plant over to the Navy. Mr. O’Neill objected, saying that their relations with the Navy were pleasant, and that it might prejudice them, and that if we did not consent to their demand that they would exercise their power under the pledge agreement and vote our stock, which of course meant that they would elect a board of directors who would comply.
A copy of the enclosure referred to above was also sent to the Chief of the Bureau of Ordnance on August 1&, 1944.
77. On August 18, 1944, a petition was filed against the plaintiff by the Seaboard Surety Company and others in the United States District Court for the Northern District of Texas, a Chapter 10, Chandler Act proceeding. A trustee who thereafter managed and controlled the plaintiff’s business was duly appointed by the court.
78. On August 22, 1944, the Chief of the Bureau of Ordnance sent the following letter to the plaintiff, with copies addressed to the Seaboard Surety Company and the trustee in bankruptcy :
The Bureau acknowledges receipt of your letter of August 14th requesting elimination of condition 7 in the proposal contained in its letter of July 29th.
Your request for eliminating such a condition clearly implies that your company or the Seaboard Surety Company, your surety, or both, consider that there exist fundamental defects to the right, of the Government, after giving due and proper notices and establishing reasonable delivery schedules which are not met *374 promptly, to cancel the subject contracts and hold your company and the Seaboard Surety Company liable for all damages and repayment of unamortized advance payments. This Bureau does not consider that any such defense or basis for avoiding such liability exists, but it could not enter into any proper amendment to the subject contracts, particularly NOrd-171, changing the terms and provisions with respect to amortization of advance payments without consent of the surety company to such amendment and the execution and delivery of such an amendment would necessarily imply a reaffirmation and restatement of your liability and its liability under the performance bonds and bonds to secure the advance payments. The Bureau cannot therefore, grant the request contained in your letter.
The Bureau wishes also to state emphatically that the statements contained in the third paragraph of your letter to the effect that operation by the “Management Committee” was forced upon your company without justification by this Bureau is without basis in fact and is entirely refuted by the clear and explicit records of this Bureau in the premises.
The Bureau also wishes to acknowledge receipt of letter dated August 15th addressed to the Chief of the Bureau of Ordnance enclosing a copy of letter from Mr. George W. Armstrong, to Mr. George Thompson, Jr., Executive Vice President of the Continental National Bank, Fort Worth, Texas, dated August 5,1944. There has also been referred to the Bureau for reply a letter dated August 14, 1944 signed by Mr. A. J. Armstrong and addressed to Mr. W. E. Compton, Counsel for this Bureau, also enclosing a copy of the letter to Mr. George Thompson, Jr. from Mr. George W. Armstrong, Sr. referred to above.
This Bureau has no knowledge of many of the matters referred to in the copy of the letter to Mr. Thompson, as these are matters between your company and its surety, the Seaboard Surety Company. Insofar as that letter states or infers that this Bureau or the Navy Department dictated who should be the management of your company at any time, such a letter is in error and not in conformity with the facts. After your company had materially and seriously failed to carry out its proper obligations under the facilities contract (NOd-2350) and appealed to this Bureau for additional facilities in order to perform supply contracts which it had entered into originally without any obligation or commitment on *375 the part of this Bureau to supply any facilities, this Bureau called upon the Seaboard Surety Company as surety on the performance and advance payment bonds to assume full responsibility for the performance of the contracts and the surety company accepted such responsibility in writing. At the request of the surety company, this Bureau indicated to the surety company that it did not consider Mr. A. J. Armstrong and Mr. George W. Armstrong, Sr. competent persons to be active in the management of the Port Arthur operation because of the completely inadequate performance of the company in that project under the management of these individuals up to that time. This position on the part of this Bureau was a purely negative one with respect to these individuals and, at no time, did this Bureau dictate or require affirmatively that the surety or your company should place any particular persons in managerial positions. The personnel of the Management Committee established in June 1942 was entirely a result of the action of the surety company and your company.
The position taken by your company in the third paragraph of the letter of August 14, 1944 gives this Bureau serious cause to consider whether it should withdraw the statements contained in its letters of July 29th and July 31st 1944 with respect to Mr. A. J. Armstrong and Mr. George W. Armstrong, Sr.
However, inasmuch as the Bureau has been advised that the United States District Court for the Northern District of Texas has appointed Mr. J. Mac Thompson, as Temporary Trustee of your company under a petition for reorganization under the Bankruptcy Act filed by your company, and this Bureau will, therefore, be dealing with the Trustee, no change in position with respect to the individuals in question is considered necessary at this time. The Bureau is not advised of the contents of said petition and the Government takes no position at this time with respect thereto.
This is to advise you, however, that this Bureau requires performance of the subject contracts promptly to the full admitted capacity of the facilities provided, and that unless such performance is forthcoming the subject contracts must be cancelled for default with the liability (attendant . thereto. Such action on the part of this Bureau will be. necessary and essential in the prosecution of the war in order to insure the prompt and efficient use of equipment of the Port Arthur plant owned by the Government for the production of' material vitally needed in the war effort.
*376 ' By copy of this letter to the Trustee, he is hereby put on notice of'the Bureau’s position as stated herein.
■ 79. Contracts NOrd-150, NOrd-153 and NOrd-171 each included the following provision with respect to disputes:
Akticle. 12. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided:by the contracting officer, subject to.written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative,-whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance.
- Contract NÓd-2350 contained the following provision with respect to disputes:
Article 23.. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Chief of the Bureau of Ordnance, subject to written appeal by the Contractor within thirty (30) days to the Secretary of the Navy or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with performance.
Contracts NOrd-150, NOrd-153 and NOrd-171 each included the following provision concerning, delays — damages:
Article 5. Delays — Damages.—If the contractor refuses or fails to make deliveries of the materials or supplies within the time specified in Article 1, or any extension thereof, the Government may by written notice terminate the right of the contractor to proceed with deliveries or such part or parts thereof as to which there has been delay. In such event, the Government may purchase similar materials or supplies in the open market or secure the manufacture and delivery of the materials and supplies by contract or otherwise, and the contractor and his- sureties shall be liable to the Government for any excess cost occasioned the. Government thereby: Provided, That the contractor shall not be charged with any excess cost occasioned the Government by the purchase of materials or supplies in the open market or under other contracts when the delay of the contractor in making deliveries is due to unforeseeable causes beyond the control and without the fault or negligence of *377 the contractor, including, but not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the contracting officer shall determine that the materials or supplies to be furnished under the subcontract are procurable in the open market, if the contractor shall notify the contracting officer in writing, of the cause of any such delay, within 10 days from the- beginning thereof, or within such further period as the contracting officer shall, with the approval of the head of the department or his duly authorized representative, prior to the date of final settlement of the contract, grant for the giving of such notice. The contracting officer shall then ascertain the facts and extent of delay,-and -his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal within 30. days by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay shall be final and conclusive on the parties hereto.
80. Thereafter Seaboard Surety Company instituted an action in the United States District Court for the Northern District of Texas against plaintiff, Texas Steel Company, and the members of the Armstrong family who were indemni-tors of the surety company, for a declaratory judgment establishing the validity of the various indemnity agreements. The case went to trial, and on May 2, 1945, a judgment was entered, determining, inter alia, that the pledge and indemnity agreements were valid obligations of the defendants in that action, and that the surety company was not liable to them for any debt or loss arising out of the Port Arthur operations. Thereafter, on January 12,1946, judgments for the payment of money were entered in said proceeding in favor of the surety company and against the defendants. Appeals were taken from both judgments to the Circuit Court of Appeals for the Fifth Circuit, which affirmed both judgments in a per curiam opinion handed down on December 6,1946.
81. At the time of the institution of the reorganization proceedings in August 1944, the Navy supply contracts outstanding were as follows:- ' ■

*378

82. Deliveries under contract NOrd-171 were completed on or about March 14,1945.
83. On March 27,1945, the trustee of the plaintiff company-in reorganization, with the consent of the Seaboard Surety Company, entered into a cost-plus-fixed-fee contract, NOrd-8706, with the Navy Bureau of Ordnance pursuant to the First War Powers Act and Executive Order 9001 whereby the trustee agreed to furnish 150,000 5-inch projectiles in lieu of the 114,000.5.-inch projectiles which were then undelivered against contract. NOrd-153 and also in lieu of the 20,000 6-inch projectiles covered by contract NOrd-150, then undelivered.
Effective July 14, 1945, contract NOrd-8706 was terminated for convenience of the defendant.
84. From the record as a whole, I find that the evidence fails to show a conspiracy between the Navy officials and the representatives of the surety company to obtain control of the plaintiff’s Port Arthur operations. The evidence shows that all that the Navy desired from the plaintiff was the projectiles which the plaintiff had contracted to deliver under the three supply contracts. As the Chief of the Production Division expressed it to an officer of the plaintiff company in a conference as early as February 1942,
* * * all the Bureau of Ordnance wants are shells out of the back end of the plant and it is the company’s responsibility to produce; * * *
85. On or about September 24, 1946, the trustee in bankruptcy of. plaintiff filed a claim with the Bureau of Ordnance of the Navy Department for (a) reimbursement of capital expended by. plaintiff and not reimbursed by the Navy, and •(b) losses and damages in connection with'its Navy contracts allegedly imputable to the Navy.
*379 The capital expenditures for which claim was filed were the following:
Unreimbursed expenditures in connection with the steel mill_$395,959.43
Unreimbursed expenditures under contract NOd-2350_ 79,980.99
Unreimbursed expenditures on facilities other than the steel mill_ 117,634.56
Unreimbursed expenditures on power and railway facilities- 24,126.01
Total- 617,700.99
The losses or damages for which claim was filed included operating losses in connection with the Navy contracts, interest expense, miscellaneous expenses, trustee and trustee’s attorneys’ accrued fees, and extraordinary expenses for the acquisition and construction of plant facilities. For the period from July 28,1941, through August 18,1944, the total of these items was $955,051.13, and for the period from August 19, 1944, to July 16, 1946, the total claimed was $335,542.08. Against the gross claim, the trustee applied credits of $40,510.59, representing miscellaneous income received and credits due the Navy for amounts charged off, leaving a net claim for loss and damage of $1,250,082.62.
86. Negotiations were thereafter had with respect to the settlement of these claims, and an agreement was reached in July 1947 whereby defendant agreed to transfer to the trustee title to all Government-owned buildings on the land described in contract NOd-2350, to release its option to purchase such land, to dismiss its condemnation proceeding against said land, and to give the trustee an option to purchase the Government-owned transformers on the land for $4,000, which option was exercised by the trustee at the same time. The trustee gave defendant the right to remove other Government-owned property from the site, waiving any claim for rent or damages, and released its entire claim for reimbursement of expenses relating to the steel mill ($395,-959.43), and $83,562.04 of its claim for unreimbursed expenditures on facilities other than the steel mill. This agreement was implemented by deeds and releases executed July 16,1947.
*380 '87. Contract NOrd-171 included the following provision:
Article 20. Federal Tax. — The pricés stipulated in this contract include any Federal tax heretofore imposed by the Congress which is applicable to the material on this bid. Any sales tax, duties, imposts, revenues, excise or other taxes whicn may after June 21, 1941 (the date of this contract) be imposed by the Congress and made applicable to the material on this bid will be charged to the Government and entered on invoices as a separate item.
During the period of performance under this contract, plaintiff expended the sum of $3,544.71 in payment of a three per cent Federal tax on transportation. This expenditure is included in the plaintiff’s statement of losses in the next finding as a separate item. This tax was paid pursuant to the Act of October 21,1942,26 U. S. C. 3475. The Navy refused to refund this sum.
88. During the period from July 1, 1941, until some time after all production ended at the plaintiff’s Port Arthur plant, the plaintiff’s-Port Arthur division sustained substantial losses. The parties are in substantial agreement as to the amount of such losses although there is some disagreement between them concerning a few adjustment items. The losses sustained by the plaintiff are classified by the periods in which such losses were incurred to the extent it has been possible to so classify them. The first period begins on July 1,1941 and ends on June 13,1942, the date of the establishment by the plaintiff of the Management Committee. The second period from June 14, 1942 until August 18, 1944, covers the period during which the plaintiff’s Port Arthur operations were operated by the Management Committee.
The third period begins on August 19,1944 and continues until July 16, 1946, during which the trustee was in charge of plaintiff’s affairs, although there was no production after July 14,1945.
There is shown below a statement of plaintiff’s losses during such periods with appropriate adjustments noted:

*381

89. As to the items shown above entitled “Losses on Navy Facilities Contract NOd-2350, Eeimbursements Disallowed by the Navy,” there is no showing in the record that such disallowances were improper nor does .the record disclose that the plaintiff appealed the disallowances.
As to the items shown above entitled “Losses on unreim-bursed expenditures for other manufacturing facilities,” there is no showing in the record that defendant requested the installation of any of these facilities, or that it agreed to reimburse plaintiff for them.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of. law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States three thousand five hundred forty-four dollars and seventy-one cents ($3,544.71).